Livingston, J.
 

 delivered the opinion of the Court as follows:
 

 This was an information, in the District Court ^f Massachusetts, against the brigantine Struggle fer the violation of the act of Congress of the 28th of June, 1809, in departing from Portsmouth, in the United Slates, with a cargo of domestic growth and manufacture, bound to a foreign port with which commercial intercourse was not then permitted.
 

 The libel further states that the vessel arrived at said prohibited port, with her cargo, and that no bond had at any time been given to the United States, in the manner required by law, that alie should not proceed to any in
 
 *72
 
 tcrdicted port, nor.be engaged.directly or indirectly, dur^ ing such voyage, in any trade with such port or place.
 

 The claim denies thedepafture of the brigantine from Portsmouth on a foreign voyage, to a port with which commercial intercourse was interdicted,, or to any other foreign port or place; but insists that she was duly cleared, at the custom house at Portsmouth, for Charleston, and that she departed and was sailing .towards her place of destination, when by the violence of the winds and waves she was driven out of her course, and became so much damaged that slip could not proceed on to Charleston; blit that it was necessary for the preservation of the vessel and cargo, and of the lives of {hose on board, to sail for’tho West Indies ; that she accordingly went to Martinico, and thence proceeded to St. Bartholomews.
 

 Tile cause beiiig at issue oh this,allegation of the Claimant, and a number of w itnesses having been examined, the. District Court condemned, the vessel as Forfeited to the United States. This decree Was affirmed by the Circuit Court, from whose sentence tiiis appeal is taken.
 

 The master of the
 
 Struggle,
 
 -who was produced as a witness,'swears that after being regularly-cleared, she sailed from Portsmouth to Charleston, the cargo being consigned to Joseph Waldron & Go. on whom lie had orders to call for advice ; but it being rumoured, at the time of his sailing, that the non.-interrourse would shortly be removed, he was informed by. the owner that orders, were given to Waldron' & Có. in that case, to'seud .the vessel to the West Indies, provided the prospects at Charleston should not be Cipual to bis expectation. ,. That 5.-or 5 days after sailing they had a very heavy gate from the. spilth west which made such a. tremendous-sea that it became impossible to keep the vessel to. .That they Ik i not less than 65000 loot of seasoned sawTd lumber on the-deck, besides lobs» lumber, all of which,..in-bis opinion, must inevitably have, been lost, if the vessel had been kept bead to. At o,né time an attempt was made to heave her io, and after' laving'a few hours, the gale increased-,and knocked the vessel dovvn, her. yards being nearly in the water, and the tpp of the deck load, .so shifted that they were obliged to put-her.before the. wind to
 
 *73
 
 right the deck load and clear thfe'companion'way. Dur~ ing several gales they were obliged to scud, and at one time for 23 hours together. They shipped several seas which washed overboard a part of the loose lutnber. About the 16th of February, the wind being less, violent, the deck load was found so much soaked that it was like green lumber, which made the vessel so crank that they could not keep on the Wind with a six knot breeze. One of the water casks was entirely leaked
 
 out;
 
 anether partly out,* arid the sails and rigging much injured. On a consultation with the people on board, they were all of opinion that it would be extremely dangcrous to attempt coming on the coast in the state in which the vessel then was, she being so top heavy as to be almost water logged. It being also the worst season in the year, they unanimously thought that the only way they .could save the.deck load, and probably their lives'; would be to make the first port they could. They accordingly boré away for the West Indies, and arrived at Martinico, which was the first, port they made. The cargo was there sold at a low price, it not being thought safe to venturo to sea again, in the then condition of the vessel. After making some repairs they sailed from Martinico for St. Bar Lijolomews, where they took' freight for Boston at which place they arrived in June, 1810.
 

 This is the history of the voyage givenby the master,, and is substantially confirmed by the mate and. two o] the seamen, who also swear that they shipped for wages usual on a voyage to Charleston, which were lower than those which were given for a voyage to the West Indies, It also appears by the documentary evidence in the case-, that the Struggle had a regular clearance on board for
 
 Charleston;
 
 that she was chartered, by the Claiiriánt, of certáin merchants of Portsmouth “to go to some southern port or to the West Indiesthat the cargo taken on board at Portsmouth was lumber, butter, and
 
 crackers;
 
 and that she returned from St. Bartholomews, to the United States, with a cargo on freight consisting of 180 casks and 9 barrels of molasses.
 

 • On these proofs the Court is now to decide whether the Claimant has made out his allegation that the vessel was driven out of her course by.thó violence of the winds and waves, and.that her-condition was such as to make
 
 *74
 
 it necessary, for her preservation and the safety of She crew, to sail for a port in the West Indies.
 

 Were the Court bound to decide according to positive testimony, without regard to other circumstances, or to the situation and character of the witnesses, it might be difficult to say that the plea of necessity had not been-satisfactorily made out. The master, mate, and two of the mariners establish every thing which the Claimant had undertaken- to prove, so far as their positive declaration^ are entitled to credit. But when it is recollected how many cases of fictitious distress have been offered to the Courts of the United States, as excuses for violations of the restrictive system, as it lias been called, and that these cases, whether r^ál or imaginary, have generally been supported by the sanie species of testimony, it cannot be wondered at if this Court, shall receive, with considerable jealousy and caution, evidence vvliich is so per- ■ pcfualiy recurring, and which if compared, will be found to present the same, uniform statement of facts, with very few shades of difference, all calculated to impress a be■ief that some overwhelming calamity, of which, in ordinary Voyages, so little is heard, has produced a departure from the original legitimate destination of the vessel. When it is considered too that the testimony on these occasions .comes from men, who, whatever their characters may be in other respects, most be viewed as accomplices in the offence, if any has been intentionally committed, and are, to say the least, very much under the influe nce of those who have projected the voyage and aré to -be gainers by a violation of the law, it cannot be supposed that, such testimony can be examined without very considerable reserve and distrust.
 

 Although mere suspicion, not resting upon strong circumstances unexplained, should not be permitted to outweigh positive, testimony in giving effect to a penal sta tute; yet it cannot be regarded as an oppressive'rule to require of a party .who lias violated it to make out the
 
 vis major muter
 
 which he shelters himself, so as to leave no reasonable doubt of his innocence; and if in the course of such vtmliratioa he shr.il pass in silence, or leave unexplained, c¡¡ cninstances which militate strongly against the.integrity of the transaction, he cannotcomplain if the Court shall lay hold of those circumstances as.reasons-
 
 *75
 
 for adjudging him
 
 in delicto.
 
 What then are the cifcumstances in this case w hich it is difficult to reconcile with the concurrent testimony of the witnesses w'ho'have been examined?
 

 .1. If the Struggle' really encountered so much bad weather and was obliged, to avoid shipwreck and to.preserve the lives of the crew, to abandon a coasting for a foreign voyage, it might be expected that, on her arrival at Martinico, the ordinary process of survey would have been called for. Her situation would then have been ascertained by professional and ski:ful men. The not taking a precaution so common in cases of distress and so necessary for the master’s exculpation if he acted without 'an understanding with his owner, while it leaves us in great doubt as to the magnitude of the injuries sustained, and the imminence of the danger to which the vessel and crew werp. thereby exposed, is but little calculated to excite a belief of the great extent of either. It is taken for granted .that no such survey was had, from the silence of all the witnesses upon the subject, and from the manifest interest which the Claimant had in producing it, if it any degree supported the testimony or the defence which he had set up.
 

 2. A still more common document, and of which, notwithstanding, we hear not a word, is a protest.. Perhaps a case never occurs that a vessel is forced to abandon a voyage without stating the reasons of such deviation in the form of a protest at the first port at which she arrives. Although, of itself, it would be no evidence, the master might have stated inuhis testimony that he had made one at Martinico. His Vint having done so subjects him to the just presumption of having neglected it altogether, and that his going thither was brought about by a necessity of his own contrivance, and not by the. act. of God, or adverse winds.
 

 Again. — Although it is said that orders were sent by the Claimant to the house of Waldron & Co. in Charleston. yet neither thes ■ orders, nor those to. the captain, both of which must be presumed to be in writing, are produced. Their suppression, (to say the least) is a circumstance of some suspicion. It may also be asked why,
 
 *76
 
 if the danger was so pressing, and the vessel nearly on her beam ends, was not-relief sought by throwing over the deck-load, or a part of it ? The Court does not mean to say that it was the master’s duty to sacrifice the car-rather than go to a foreign port; but from his not disembarrassing himself of an incumbrance which must have been so much in his way, it may well be doubted whether the situation of the brig were as perilous as is now represented, or the lives of the crew exppsed to the dangers we uow hear of.
 

 From the declarations of the Claimant as to his intentions previous to the voyage an argument was drawn in his favor.
 

 It is sufficient'to say. that such declarations are not evidence, and if they were, ms ht. in a case otherwise mysterious, rather increast than lu suspicion. As little dependence is to be placed on the fact, that for a foreign vo , age, higher wages would have been demanded than for one to Charleston, Although the original agreement with the mariners may have been, and probably was for Charleston, there can he no doubt that the owner would have an interest, in a case of this kind, tq raise them full as high as seamen would‘have a right, to' expect, if the vessel were carried, and especially without a palpable necessity," to an interdicted foreign port.
 

 Considering then, the suspicious source from which the testimony is derived, and the unfavorable and unexplained circumstances which have been stated, the Court is unanimously of opinion, that the sentence of the Circuit Court must be affirmed.