STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v.
MICHAEL TATE, DEFENDANT-RESPONDENT.

Argued Sept. 23, 1985.   Decided February 24, 1986.

*Paul F. Chaiet*, Assistant Prosecutor, argued the cause for appellant (*John A. Kaye*, Monmouth County Prosecutor, attorney; *James W. Kennedy*, Assistant Prosecutor, of counsel and on the brief).

*Robert I. Ansell* argued the cause for respondent (*Anschelewitz, Barr & Ansell*, attorneys).

*Linda L. Yoder*, Deputy Attorney General, argued the cause for *amicus curiae* Attorney General (*Irwin I. Kimmelman*, Attorney General of New Jersey, attorney).

*Richard L. Plotkin* submitted a brief on behalf of *amicus curiae* The Alliance for Cannabis Therapeutics (*Pitney, Hardin, Kipp & Szuch*, attorneys; *Karen J. Henderson* and *Mikol S.B. Neilson*, members of the District of Columbia bar, of counsel).

The opinion of the Court was delivered by

CLIFFORD, J.

Defendant, Michael Tate, is afflicted with quadriplegia. The spasticity associated with that condition is sometimes so severe

as to render defendant completely disabled. He claims that the use of marijuana provides relief. Indicted under *N.J.S.A.* 24:21–20(a)(4) for possession of over twenty-five grams of marijuana, defendant notified the State of his intention to rely on the defense of "medical necessity." He claims the defense under *N.J.S.A.* 2C:3–2(a), which provides standards for determining whether conduct that would otherwise constitute a criminal offense is justifiable by reason of necessity.

The trial court denied the State's motion to strike that defense, ruling that under the circumstances presented defendant was not foreclosed from asserting the defense of "necessity" based on justifiable conduct. 194 *N.J.Super.* 622 (1984). The Appellate Division affirmed, with one judge dissenting. 198 *N.J. Super.* 285 (1985). We granted the State's motion for leave to appeal, and now reverse.

I

The record discloses that the Manalapan Police Department received a report from an informant that defendant was selling narcotics from his parents' home to Manalapan High School students. Pursuant to a search warrant the police conducted a search of Tate's room on March 29, 1983. The officers recovered a large amount of marijuana, a scale, paraphernalia, and money. They thereupon charged defendant with possession of marijuana and possession with intent to distribute. He was indicted only for possession of over twenty-five grams of marijuana in contravention of *N.J.S.A.* 24:21–20(a)(4).

Defendant served notice on the Monmouth County Prosecutor that he would rely at his trial on the "justification" defense by virtue of "medical necessity." He contended that he was prepared to present evidence that he uses marijuana because it eases the effects of spastic contractions regularly suffered by quadriplegics, and that no other prescribable medication gives him such relief. The prosecutor moved to strike the defense, contending that defendant's claim of "medical necessity" does

not fall within the ambit of the Code defense of "justification," *N.J.S.A.* 2C:3–2(a). The State argued that defendant had failed to seek a legal alternative to his self-prescriptions in that he had not applied for such use under the Controlled Dangerous Substances Therapeutic Research Act, *N.J.S.A.* 26:2L–1 to –9 (TRA), and that defendant had failed to indicate through discovery any medical evidence that his condition is alleviated by the use of marijuana.

At the hearing conducted by the trial court, Dr. Thomas Culkin, who was the Executive Director of the Drug Utilization Review Council in the State Department of Health, and Administrator of the Controlled Dangerous Substances Therapeutic Research Program, testified for defendant. He stated that the purpose of the TRA was "to make available through physicians in the State of New Jersey under highly controlled circumstances Schedule I substances. Among those are marijuana, heroin and a number of other substances * * * for the purposes of alleviating patients in whom regular therapy has not worked." He noted that at its inception, the program was funded at a level of $25,000, but that it "has never gotten off the ground in any practical sense."

## II

Before turning to the statute on which defendant relies, *N.J.S.A.* 2C:3–2(a), we deem a few preliminary observations to be in order, particularly in light of the thoughtful dissenting opinions.

We focus first on the purposes behind the New Jersey Penal Code, in which the legislature manifested a deep concern with the common-law development of our criminal law. That concern found expression in a broad and sweeping codification that had as one of its main objectives the taking away from the courts of much of their discretion. The Criminal Law Revision Commission (Commission) adopted the following statement when it submitted its final report:

The time has come to create, for the first time in our history, a systematic, consistent, comprehensive [state] code to replace the hodge-podge that now exists. If criminal law is to be respected, it must be respectable. Important areas of [state] criminal law have never been put in statutory form * * *. It seems clear that such matters should not be left entirely to shifting and contradictory disposition by judges. [*The New Jersey Penal Code, Final Report of New Jersey Criminal Law Revision Commission*, Vol. I at ix (1971) (hereinafter *Final Report*).]

■ The codification of New Jersey's criminal law reflected a "change in the basic responsibility for the growth and modernization of the criminal law—from court to legislature." *Final Report*, Vol. II: Commentary at 11. There is no question that included in the responsibilities shifted from the courts to the legislature was the responsibility for defining the scope of former common-law defenses.

The Commission would recommend codification of the general part of the criminal law. It is no longer sufficient for our statutes to simply define the elements of offenses. Modernization and rationalization compel enactment of statutory law on topics relating to culpability, excuse, justification, responsibility, etc. While our Supreme Court has done well to keep the common law alive and fluid in these areas, a more adequate job can be done by moving them into the area of legislative responsibility. The court itself has recognized that many changes must come from the Legislature. [*Final Report*, Vol. I at ix.]

Among the Commission's recommendations was one calling for the codification of the common-law defense of necessity. In urging that codification the Commission recognized that the definition and application of the defense, as well as its scope, should for the most part be left to the judiciary. *Final Report*, Vol. II at 80. It would be a mistake, however, to interpret that recognition as signalling a conclusion that this Court is free to define the defense without any restrictions by the Penal Code. We are reminded that "[t]he discretionary powers conferred by the code shall be exercised in accordance with the criteria stated in the code * * *." *N.J.S.A.* 2C:1-2(c).

### III

■ It is with the foregoing observations in mind that we examine *N.J.S.A.* 2C:3-2(a), the statutory section covering "necessity." The discretion left to the courts by that statute is

governed by criteria specifically set forth therein. The section reads:

> *Necessity.* Conduct which would otherwise be an offense is justifiable by reason of necessity to the extent permitted by law and as to which neither the code nor other statutory law defining the offense provides exceptions or defenses dealing with the specific situation involved and a legislative purpose to exclude the justification claimed does not otherwise plainly appear.

In that one short paragraph the Legislature managed to set forth three limiting criteria governing the defense: (1) conduct is justifiable only to the extent permitted by law, (2) the defense is unavailable if either the Code or other statutory law defining the offense provides exceptions or defenses dealing with the specific situation involved, and (3) the defense is unavailable if a legislative purpose to exclude the justification otherwise plainly appears.

■ If we follow the mandate to limit the exercise of our discretion in accordance with these governing criteria, the conclusion is inescapable that Michael Tate is not entitled to the defense of "necessity" in this case. First, the conduct is not "permitted by law." Second, other code provisions have dealt with the specific situation involved. And third, legislative intent to exclude the justification urged here does "otherwise plainly appear." Hence, the legislature has made clear its determination that this Court shall not have the discretion to make the "necessity" defense available to this defendant.

Three separate provisions of Title 24 compel the conclusion that Tate is precluded from arguing the defense that he seeks to assert. The first is *N.J.S.A.* 24:21–5(a), which classifies marijuana as a Schedule I controlled dangerous substance. Its denomination as such means that the legislature has determined that marijuana has "high potential for abuse" and has "no accepted medical use in treatment * * * or lacks accepted safety for use in treatment under medical supervision." The possibility of medical use of marijuana was thus specifically contemplated and specifically rejected.

The legislature nonetheless demonstrated foresight by leaving room for the possibility that scientific developments and advances in knowledge could ultimately render marijuana's Schedule I classification inappropriate: it enacted the second significant provision, *N.J.S.A.* 24:21–3(a), which granted to the Commissioner of Health the authority to reschedule marijuana (and all scheduled controlled dangerous substances), giving consideration to, *inter alia*, current scientific knowledge. At this juncture the Commissioner has not exercised that authority in respect of marijuana.

The third relevant section, *N.J.S.A.* 24:21–20(a), provides further—and even clearer—evidence that the legislature gave consideration to possible medical uses of controlled dangerous substances. That section defines the offense with which defendant is charged. It provides:

> It is unlawful for any person, knowingly or intentionally, to obtain, or to possess, actually or constructively, a controlled dangerous substance *unless such substance was obtained directly, or pursuant to a valid prescription or order from a practitioner, while acting in the course of his professional practice,* or except as otherwise authorized by this act. [*Id.* (emphasis added).]

The emphasized language amounts to an exception set forth in the "offense" statute itself—an exception for medically-necessary possession of marijuana. In creating that exception the legislature went so far as to spell out an indispensable condition for possession of a controlled dangerous substance, namely, "a valid prescription or order from a practitioner * * *." Because defendant did not possess a valid prescription, he cannot claim the protection of this statutory exception. And because the legislature provided this exception dealing with the specific situation presented here, this Court is without authority to fashion an alternative exception for defendant under the Code's "necessity" section, *N.J.S.A.* 2C:3–2(a).

■ The foregoing provisions of Title 24 preclude the defense of "necessity" both because they specifically deal with the exception urged and because they evidence a legislative intent to preclude the defense except under the conditions set forth,

*i.e.*, with a valid prescription. But there is more. The enact-ment of the TRA, *N.J.S.A.* 26:2L–1 to –9, gives further support to the conclusion that the legislature's purpose was to exclude the defense of "necessity" in the circumstances before us. Although scientific and medical knowledge have not yet prompt-ed the rescheduling under *N.J.S.A.* 24:21–3(a) of marijuana as a non-Schedule I substance, the legislature has recognized mari-juana's potential for beneficial medical uses. The TRA pro-vides a way to permit study of and experimentation with those uses while maintaining the protection intended by the Con-trolled Dangerous Substances Act. Use of a controlled danger-ous substance under the auspices of the TRA is not a violation of the criminal provisions regarding use of those substances. *N.J.S.A.* 26:2L–9.

We are instructed by the drafters of the New Jersey Penal Code to look to the Model Penal Code and New York Penal Code for guidance in applying *N.J.S.A.* 2C:3–2(a). *Final Re-port*, Vol. II at 80. Examples given under those codes demon-strate that the type of legislative consideration shown by *N.J. S.A.* 24:21–20(a) and by the TRA would preclude, under those codes, any judicial exercise of a choice to extend the defense to other circumstances. For example, if an abortion statute clear-ly forbade therapeutic abortions or allowed them only in certain circumstances, that statute would stand as a clear indication that the legislature had weighed the value of forbidding abor-tions against the value served by permitting therapeutic abor-tions. In that case courts would not be free in an abortion prosecution independently to weigh these competing values. Model Penal Code, Tent.Draft No. 8, § 3.02, comment (1)(b) (1958).

We are therefore satisfied that our legislature has contem-plated the defense urged by Michael Tate, has provided a specific exception dealing with it (*N.J.S.A.* 26:2L–1 to –9; *N.J. S.A.* 24:21–20(a)), and has made plain its intent to exclude the defense except as specifically provided. Therefore *N.J.S.A.*

2C:3–2(a) does not allow the extension of this defense under conditions not permitted by the legislature.

We are further persuaded to the conclusion expressed above by the realization that a contrary result would require a suborning of criminal activity of another who would have available no suggestion of any defense at law. The use of marijuana in the manner for which Tate here seeks our approval requires a supplier who necessarily obtains and supplies in contravention of statutory law. All else aside, it is inconceivable that the legislature intended to sanction this activity by conferring a blessing on the use of the illicit drug.

## IV

Because the defense of "medical necessity" is clearly precluded by statutory language, we need not look to the common-law defense of "necessity" for guidance. This Court's common-law gap-filling authority with regard to the criminal law should be exercised only when there is in fact a gap to be filled. There is none. Moreover, even were we to resort to the common law, we conclude, contrary to the position of our dissenting colleagues, that even under common law, a "necessity" defense would not be available in this case.

The common-law defense of "necessity" is often referred to as the "choice-of-evils" defense. W. LaFave and A. Scott, *Handbook on Criminal Law* 382 (1972) (LaFave & Scott). Conduct that would otherwise be criminal is justified if the evil avoided is greater than that sought to be avoided by the law defining the offense committed, or, conversely, if the conduct promotes some value higher than the value of compliance with the law. Arnolds & Garland, *The Defense of Necessity in Criminal Law: The Right to Choose the Lesser Evil*, 65 *J.Crim.L.C. & P.S.* 289 (1974). The defense is based on public policy. In essence it reflects a determination that if, in defining the offense, the legislature had foreseen the circumstances faced by the defendant, it would have created an exception. It

would have balanced the competing values and chosen the lesser evil. Obviously, then, the defense is available at common law only when the legislature has not foreseen the circumstances encountered by a defendant. If it has in fact anticipated the choice of evils and determined the balance to be struck between the competing values, defendants and courts alike are precluded from reassessing those values to determine whether certain conduct is justified. LaFave & Scott, *supra*, at 382.

■ The legislature has weighed the competing value of medical use of marijuana against the values served by prohibition of its use or possession, and has set forth the narrow circumstances under which that competing value may be served. Outside those narrow circumstances, the value of medical use of marijuana cannot be deemed to outweigh the values served by its prohibition. *See also Bice v. State*, 109 *Ga.* 117, 120, 34 *S.E.* 202, 203 (1899), (statute prohibiting carrying of liquor to a church provided exception for physicians. "The statute itself fixes the exceptions to the operation of the law. To these we cannot make any addition.").

■ In addition, the common-law defense is unavailable because defendant failed to satisfy a necessary prerequisite to its invocation. To claim the defense of "necessity" a defendant must show the absence of an available alternative. LaFave & Scott, *supra*, at 387; *State v. Diana*, 24 *Wash.App.* 908, 913–14, 604 *P.2d* 1312, 1316 (1979); *United States v. Randall*, 104 *Daily Wash.L.Rpts.* 2249, 2252 (D.C.Super.Ct.1976); *Bice v. State, supra*, 109 *Ga.* 117, 34 *S.E.* 202.

Marijuana may be obtained for certain medical uses from the New Jersey Commissioner of Health under the TRA or from the federal Food and Drug Administration. The dissenters agree with the defendant that the TRA did not provide a real alternative because the program "is generally unimplemented and ineffective." *Post* at 85 n. 2. While it is true that no application for substance use under the TRA had been approved at the time of defendant's arrest, it is not true that the program

was "unavailable." Although specific funding apparently was permitted to lapse intermittently, the Commissioner of Health was available to act on applications, and the record informs us that at least two members were appointed to a Qualification Review Board, established for the purpose of reviewing practitioners and patients for participation in the program. Department of Health general funding was available for administrative expenses. Even if the TRA had not been enacted, marijuana is and was legally available through the FDA for certain medical uses, including relief of spasticity.[1]

The defendant cannot make a choice to reject a legal alternative on the ground that it is too burdensome. Since a legal alternative was available, the illegal alternative was not "necessary," and resort to it was not justified. This is so even under the test adopted by Justice Handler's dissent, *post* at 90–91 (there must be an absence of any other lawful treatment, substance, or procedure that is available to the medical profession for the defendant that could similarly relieve the harmful condition or accomplish the same result as that achieved through the unlawful conduct).

## V

The judgment of the Appellate Division is reversed. The cause is remanded for further proceedings not inconsistent with this opinion.

HANDLER, Justice, dissenting.

The issue presented in this appeal is the availability of the defense of justification to a criminal indictment for the unlawful possession of marijuana. The defendant is a quadriplegic who asserts that his use of marijuana is a "medical necessity"

---

[1]Marijuana and its component delta-9-tetrahydrocannabinol (THC) are available through the FDA by virtue of Investigational New Drug (IND) studies. In 1983 there were seventy-nine such active studies, eight of which dealt with spasticity. H. Jones and P. Lovinger, *The Marijuana Question* 436 (1985).

because it is the only treatment that can ease the pain of severe, recurring spastic contractions. The defense is claimed under the New Jersey Code of Criminal Justice, *N.J.S.A.* 2C:3–2(a). The Court today rejects the defense. It expresses the view that the Code constitutes a statutory codification that supplants any common-law principles that would otherwise elucidate the meaning of this defense, and, looking to particular provisions of *N.J.S.A.* 2C:3–2(a), it rules that medical necessity for the possession of marijuana is not allowed as a justification defense under the Code.

In my opinion the Court misperceives the purpose and effect of the Legislature's codification of the common-law necessity doctrine and errs in discounting the common-law antecedents of the Code justification defense; it also reads the Code much too strictly in interpreting and applying the operative statutory language. I take a different tack and reach a different conclusion. It is my view that under the Code the defense of justification based on medical necessity is available with respect to the use of marijuana in the context of the limited and special circumstances that are present in this case. I therefore dissent from the opinion of the Court.

I.

The justification defense outlined by the Code in *N.J.S.A.* 2C:3–2a.1 is not self-defining. It obviously is not susceptible of an interpretation based solely upon provisions that are plain, unambiguous, and admit of only one meaning. See *State v. Butler*, 89 *N.J.* 220, 226 (1982). Hence we must look to extrinsic sources to elucidate that meaning.

In this interpretive exercise, it is of some significance that the drafters of the New Jersey Code intended that the Code defense of justification track generally the Model Penal Code (MPC). In doing so, the drafters of the New Jersey Code and the Legislature, which endorsed their views, did not repudiate the common-law doctrine of necessity as lending content and

meaning to the Code defense. Indeed, the relevance of the common-law was specifically recognized. In its Final Report, the Criminal Law Revision Commission explained that the defense of necessity could not be given a fixed or static statutory meaning. The rarity of the defense and the imponderables of the particulars of specific cases convinced the Commission that the courts on a case-by-case basis could best define and apply the defense. Moreover, the Commission determined that the continued explication and application of the necessity defense was more appropriately left to the judiciary rather than the Legislature. Thus, by *N.J.S.A.* 2C:3–2b, the Commission explicitly stressed the continued relevance of the common law, *viz:*

While we are confident that the Code defines all proper justification defenses, we would not want to destroy by inference a proper, but unusual, defense which we have failed to include. We, therefore, make sufficient any defense of justification permitted by the common law and not inconsistent with a deliberate legislative choice. [*Final Report Commentary* § 2C:3–2.]

Contrary to the approach taken by the majority, which eschews any reference to the common-law origins of this unique defense, the judiciary was explicitly adjured by the Legislature to develop this defense on a progressive decisional basis, albeit within statutory parameters. For that reason the common-law exposition of this special doctrine is not only generally enlightening and historically curious, it is inescapably germane to an informed understanding of the nature and scope of the necessity defense.

The Code provision for necessity-justification encapsulates a criminal defense that has been long recognized at common law in a variety of forms and contexts. This defense has been described as a legal excuse when the physical forces of nature or the pressure of circumstances cause the accused to take unlawful action to avoid a harm that social policy deems greater than the harm resulting from a violation of the law. W. LaFave & A. Scott, *Handbook on Criminal Law*, 381–83, 386 (1972). It has been stated that "where the act done was necessary or reasonably seemed to be necessary to save life or limb or health and did not in itself in any way endanger life,

limb or health, the exculpatory effect of the necessity is clear; but where the offense charged is not one of particular gravity, the courts have not hesitated to recognize necessity as an excuse where the danger or apparent danger to be avoided was less serious in its nature." R. Perkins, *Criminal Law* 848 (1957).

Numerous cases illustrate the breadth and diversity that characterize the common-law necessity defense. For example, in the early common law it was acknowledged that if a prison caught fire and a prisoner departed to save his life, the necessity to save his life "excuseth the felony." 1 Hale P.C. 611 (1736). It has been held to be justifiable for a ship's crew to revolt and return to port because the vessel was unseaworthy, *United States v. Ashton*, 24 *F.Cas.* (C.C.Mass.1834) (No. 14,-470); for a ship to enter and take refuge in a blockaded port because of a violent storm, *The William Gray*, 29 *F.Cas.* 1300 (C.C.N.Y.1810) (No. 17,694); for a ship to dock at an embargoed port if forced to by storms in an effort to save lives of the crew, *The Brig Struggle v. United States*, 13 *U.S.* (9 Cranch) 71, 3 *L.Ed.* 660 (1815); for a vehicle to stop at a prohibited place, due to heavy traffic, *Commonwealth v. Brooks*, 99 *Mass.* 434 (1868); for a parent to withdraw his child from school without the consent of the school board because of the child's ill health, *State v. Jackson*, 71 *N.H.* 552, 53 *A.* 1021 (1902); for a person to kill a deer in violation of the game laws in order to protect his property, *State v. Ward*, 170 *Iowa* 185, 152 *N.W.* 501 (1915); and for a person to violate the speeding laws in order to apprehend a fleeing felon, *State v. Gorham*, 110 *Wash.* 330, 188 *P.* 457, 9 *A.L.R.* 365 (1925).

The decisions that permit the invocation of the necessity defense to criminal conduct have running through them certain common threads, such as the immediacy or actuality of the harm, the absence of an available alternative, a reasonable belief that the harm will occur if the unlawful action is not undertaken, and the perceived need to take such action to avoid a greater evil. Note, *Medical Necessity as a Defense to*

*Criminal Liability: United States v. Randall,* 46 *Geo. Wash. L.Rev.* 273, 277–78 (1978). The doctrine recognizes that under force of extreme circumstances conduct that would otherwise be criminal can be considered to be legally justifiable and socially tolerable. *United States v. Dorrell,* 758 *F.*2d 427 (9th Cir.1985); *see* Note, *Justification: The Impact of the Model Penal Code on Statutory Reform,* 75 *Colum.L.Rev.* 914, 916 (1975); 1 *Wharton's Criminal Law* § 88, 409 (1978). The defense, however, is not applicable where the compelling circumstances have been brought about by the accused or where a legal alternative is available to the accused. *United States v. Randall,* 104 *Daily Wash.L.Rptr.* 2249, 2252 (D.C.Super.Ct. 1976); *Bice v. State,* 109 *Ga.* 117, 34 *S.E.* 202 (1899).

New Jersey's statutory codification of the necessity-justification defense, *N.J.S.A.* 2C:3–2a, is derived in part from the Model Penal Code. It is readily apparent that the MPC treatment of this defense is heavily influenced by its common-law origins. The several components comprising the necessity-justification defense of the MPC are broadly reflective of common-law principles. It contemplates that a choice of evils exists when a person acts in an unlawful manner that he or she believes to be necessary to avoid a personal harm or evil; this conduct may be justifiable provided that the harm or evil sought to be avoided by such conduct is greater than that sought to be prevented by the law defining the offense. MPC § 3.02. The commentary that explains the defense further expounds upon its common-law themes. Thus, the defendant first must actually believe that his or her conduct is necessary to avoid an evil; a belief that such behavior possibly may be conducive to ameliorating certain evils is insufficient. MPC § 3.02, Comment 2 (1985). The evil or harm to be avoided must be greater than the evil or harm sought to be avoided by the law defining the offense charged. *Ibid.* The balancing of evils is not committed to the private judgment of the actor. *Ibid.* Further, recklessness or negligence in bringing about the situa-

tion requiring the choice of evils can preclude the defense. *Ibid.*

The MPC, however, is not a mere restatement of the common law. Reflecting legislative absorption of the subject matter, the MPC further provides that there can, be no legal justification if either the MPC or another statute defining an offense provides exceptions or defenses dealing with the specific situation involved, or a legislative purpose to exclude the asserted justification otherwise plainly appears. MPC § 3.02. Thus, the defense cannot succeed if the issue of competing values has been previously foreclosed by a deliberate legislative choice. MPC § 3.02, Comment 2. Thus, the MPC treatment of justification, which is rooted in the common law, is highly relevant to a proper understanding of that defense under our own Code of Criminal Justice.

## II.

Under the New Jersey Code, the Legislature pointedly elected not to define the discrete elements of the necessity-justification defense. The substantive standards that govern the defense are not set forth. Provision for the defense is made only by the broadest reference possible; it is described simply by its own labels, *i.e.,* "justification" and "necessity." *N.J.S.A.* 2C:3–2(a). As in the case of the MPC, there is every reason to believe that, by virtue of this almost-generic designation of the justification defense without further definitional elaboration, the Legislature intended to invest the defense with the protean meaning that it had acquired at common law. It is thus fair to conclude that the Code defense embraces the essential elements with which the defense was invested in the course of its long common-law evolution. Further, it is safe to assume that by incorporating the common-law under-standing of the justification defense the Code also absorbed the common law's inherent capacity to grow, change and adapt. See *Renz v. Penn Central Corp.,* 87 *N.J.* 437, 440 (1981).

The New Jersey Code of course is a legislative product. Paralleling the MPC, the Code, along with its broad and unembellished designation of the justification defense, also provides that if the conduct sought to be justified itself has been clearly precluded or foreclosed by a deliberate legislative determination, the defense cannot be invoked. Under the Code, if (1) either the Code itself or another statutory law defining the offense provides exceptions or defenses dealing with the specific situation involved or (2) a legislative purpose to exclude the justification claimed otherwise plainly appears, justification cannot be urged as a defense. *N.J.S.A.* 2C:3–2a. Thus, aside from whether the offense charged in this case is amenable to the substantive standards of the necessity-justification defense, an initial inquiry may logically be made as to whether the defense has been preempted by other statutory prohibitions. The interpretation and application of these limiting provisions are crucial to the outcome of this case.

Focusing upon these limitations, the majority rules that there is a legislative purpose to exclude the justification defense for the possession of marijuana. Such a legislative purpose is said to be found in the Legislature's classification of marijuana as a Schedule I controlled dangerous substance under Title 24. *N.J. S.A.* 24:21–5. This, it is claimed, demonstrates an intent to preclude any legal justification for the use of marijuana under *N.J.S.A.* 2C:3–2a.

Under *N.J.S.A.* 24:21–5a, substances may be classified as Schedule I for the following reasons: (1) the drug or substance has a high potential for abuse; (2) the drug or substance has no accepted medical use in treatment in the United States; or (3) there is a lack of accepted safety for use in treatment of the drug or other substance under medical supervision. The Court seems to assume that because a Schedule I drug by definition has "no currently accepted medical use," any use asserted on the basis of "medical necessity" could not have been within the legislative contemplation. *Ante* at 70. The Court necessarily presumes that the terms "accepted medical use" and "medical

necessity" are equivalent expressions and have exactly the same meaning. As a consequence, if the drug has no "accepted medical use," it can have no use based on "medical necessity."

The validity of this position turns on what the Legislature meant by the phrase "accepted medical use" in defining Schedule I controlled dangerous substances. This standard suggests that a medical use is one that is generally accepted by the medical profession. *Compare U.S. v. 1,048,000 Capsules More or Less, etc.*, 347 *F.Supp.* 768 (S.D.Tex.1972) ("generally accepted" means extensive recognition rather than universal acceptance); *U.S. v. X–O TAG Plus Tablets*, 441 *F.Supp.* 105 (D.Colo. 1977) (generally the same), with *U.S. v. An Article of Drug ... Neo-Terramycin Soluble Powder Concentrate*, 540 *F.Supp.* 363 (N.D.Tex.1982) (where there is a genuine difference among experts, drug cannot be generally recognized as effective); *U.S. v. 354 Bulk Cartons*, 178 *F.Supp.* 847 (D.N.J.1959) (same).

There is, moreover, a parallel between the statutory phrase, "accepted medical use," and the evidentiary standard governing the competency and admissibility of scientific evidence. Generally, scientific reliability is the basis upon which otherwise disputable scientific evidence is rendered competent. It suffices for these purposes if there is general acceptance within the scientific community that the scientific subject-matter is reliable. *E.g. Romano v. Kimmelman*, 96 *N.J.* 66 (1984) (general acceptance within scientific community demonstrates scientific reliability of breathalyzer tests); *State v. Hurd*, 86 *N.J.* 525 (1981) (general acceptance within the scientific community demonstrates scientific reliability of hypnosis). This standard is applicable to the fields of medical science. *E.g., State v. Kelly*, 97 *N.J.* 178 (1984) (general acceptance within the professional community of scientific reliability of "battered women's syndrome" demonstrates competency of this evidence); *Evers v. Dollinger*, 95 *N.J.* 399 (1984) (general recognition by the medical profession coupled with general public acceptance demonstrates medical reliability of proposition that delayed diagnosis increases risk of cancer); *State v. Hurd, supra; cf. State v.*

*Cavallo,* 88 *N.J.* 508 (1982) (absence of general professional acceptance of reliability of rapist profile renders such evidence incompetent).

Such reliability, however, does not depend upon unanimous belief or universal agreement within the scientific community as to the acceptability of the subject-matter. Thus, the admissibility standard implicitly recognizes that a scientific or medical matter that is not generally or widely accepted by the professional community as being reliable, and therefore incompetent as evidence, could nevertheless be effective in an individual situation. See *State v. Cavallo, supra,* 88 *N.J.* 508 *see also State v. Melvin,* 65 *N.J.* 1 (1974) (even though a polygraph test may be effective in individual cases, it is not generally accepted in scientific community as reliable and its results are therefore generally inadmissible in evidence); *State v. Andretta,* 61 *N.J.* 544 (1972) (regardless of its accuracy in an individual case, voice print not shown to be scientifically acceptable and therefore inadmissible in evidence). Such individualized efficacy, however, would not render the particular subject matter competent for purposes of admissibility in evidence.

There is no reason to believe that the Legislature did not contemplate the traditional understanding of scientific reliability when it used the language, "accepted medical use" with respect to classifying controlled dangerous substances. So understood, an "accepted medical use" is one that would be generally recognized by the professional community as being reliable and effective for general medical purposes. Consequently, a medical use that is efficacious only in a unique, special or isolated individual case would, for that reason alone, not constitute an "accepted medical use." Thus, a Schedule I drug under Title 24 is one that does not have a universally recognized or generally accepted medical use, even though it might have an effective individualized or idiosyncratic use. Put differently, even though a drug may have an effective or successful individualized use, if its medical use is not generally

accepted, it will still be classified as a proscribed Schedule I substance.

What this suggests is that in considering the kinds of drugs or substances that should be banned, the Legislature did not focus upon the idiosyncratic or unique uses of such products. The Legislature itself determined that the individualized use of drugs was not directly relevant to the prohibitions of Title 24. Indeed, it recognized that Schedule I drugs, which by definition have no generally accepted medical use, may nevertheless be medically effective in unique cases. The Legislature has declared under the Therapeutic Resource Act, *N.J.S.A.* 26:2L–1 to –9, that recent medical research has shown that the therapeutic use of certain Schedule I controlled dangerous substances may alleviate the nausea and ill effects of certain medical treatment, such as cancer chemotherapy, and, additionally, may alleviate the ill effects of certain diseases, such as glaucoma. *N.J.S.A.* 26:2L–2. Moreover, the Legislature recognized that there is a need for further therapeutic research with regard to the use of such controlled dangerous substances for these purposes under strictly controlled circumstances.[1] *Ibid.*

---

[1]The Legislature is not alone in its recognition of the potential therapeutic uses of marijuana. As of 1983 the Federal Food and Drug Administration (FDA) had approved seventy-nine Investigational New Drug (IND) plans to permit studies of THC and cannabis for therapy. Of these studies fifty-three dealt with nausea and vomiting from cancer therapy, thirteen studies in intraocular pressure or glaucoma, eight studies examined the effects of cannabis on spasticity, three dealt with anorexia and weight loss and two studies addressed miscellaneous syndromes. H.C. Jones and D.W. Lovinger, *The Marijuana Question*, p. 136 (1985). Of twenty-five states enacting statutes on medical use of cannabis or THC by 1980, officials in 12 secured federal approval for clinical research trials. In the next three years, eight more states enacted such statutes. *Id.* at 438.

All of the federally approved state programs dealt with the antiemetic matter. As of January 1983, state glaucoma programs existed in five states. The laws of eleven states also provide for medical treatment with marijuana as T.H.C. *Id.* In addition to the antiemetic or glaucoma studies, studies have been conducted to test marijuana effects on appetite stimulation (to curb anorexia),

The Court itself acknowledges that the limited or exceptional uses of a Schedule I drug that are authorized under Title 24 pursuant to the TRA would involve drugs whose medical use is not generally accepted. *Ante* at 72. It reasons, however, that the only uses of a drug that could qualify as a "medical necessity" under the Code's justification defense would be those undertaken exclusively pursuant to the TRA. I disagree.

There is nothing in Title 24 or the Code provision for the necessity-justification defense that impels such an interpretive strait-jacket. It is evident that in the enactment of the TRA the Legislature intended to permit the uses of Schedule I substances in conjunction with medical research and treatment under suitable regulatory, institutional and professional controls. Such uses might or might not serve to relieve patient-suffering in individual cases. The uses under this programatic scheme, however, are not likely to reach the kind of situation that might arise in the case of an individual suffering severely and acutely from a condition that can be treated only by the use of the Schedule I drug where no TRA program is available or feasible. The empirical history of the TRA program demonstrates its extremely limited scope. The meticulous and burdensome standards for lawful use under the TRA markedly discourage and restrict its availability in individual cases.[2]

---

convulsions, spasticity, anxiety, depression and cancer all with varying results. Institute of Medicine, *Marijuana and Health,* 139–151 (1982).

[2] At the hearing conducted by the trial court, Dr. Thomas Culkin, who was the Executive Director of the Drug Utilization Review Council in the State Department of Health, and Administrator of the Controlled Dangerous Substance Therapeutic Research Act, testified for the defendant. He stated that the purpose of the TRA was "to make available through physicians in the State of New Jersey under highly controlled circumstances Schedule I substances. Among those are marijuana, heroin and a number of other substances * * * for the purposes of alleviating patients in whom regular therapy has not worked." He noted however, that the program is generally unimplemented and ineffective. Also, according to this witness, any program developed under the TRA requires the approval of the FDA and that agency prefers programs designed for cancer patients.

These circumstances, so apparent to us, surely were not lost to our legislators.

If the TRA exception were the sole criterion for the allowable or excusable use of a Schedule I drug, it would present an insurmountable obstacle to a Schedule I drug ever being considered "medically necessary," no matter how dire, extreme or compelling the individual's need. One might reasonably expect that if it were the intention of the Legislature that the specific TRA uses constitute the exclusive exception to the unlawful possession of Schedule I substances, that exception would be stated expressly under the Code or under Title 24. See *N.J. S.A.* 2C:3–2a (justification defense is available if Code or other statute defining offense does not provide exception or defense dealing with "specific situation".)

The Court also relies on *N.J.S.A.* 24:21–20(a) as further evidence of a legislative purpose to exclude a Schedule I substance as part of the justification defense. This statutory provision prohibits the knowing or intentional procurement or possession of a controlled dangerous substance unless it was obtained directly or pursuant to a valid prescription or order from a practitioner in a professional capacity or as authorized by the act. The Court takes the position that the Legislature has thereby expressly provided an exception covering the "spe-

---

In addition, Dr. Culkin also discussed a similar federal program that involves the use of drugs for, among other things, alleviating the side effects of cancer treatment for patients. He noted the case of one patient who was receiving marijuana for treatment of glaucoma through such a program. In that program, "[a] physician has to send in all the paper work, establish his credentials, the patient's need, etc. and the Food and Drug Administration has to then approve such a request."

Dr. Culkin further testified that in 1983, in an attempt to get the TRA program initiated, the Department of Health sent a letter to over 15,000 physicians in the State alerting them to the existence of the program and inviting interested physicians to submit research studies. Only one bona fide study was submitted but the TRA was unable to acquire the requested drug.

cific situation" contemplated by the asserted necessity-justification defense. *N.J.S.A.* 2C:3–2a. *Ante* at 71.

The Court assumes that because a defendant is suffering from a medical condition that necessitates his use of a proscribed drug, its use can be rendered lawful only if it is validly prescribed or ordered by a physician; only if a drug is validly authorized by a physician can its medical use be deemed legally necessary. The flaw in this analysis is the assumption that justification through medical necessity is identical with lawful possession. The infirmity in the Court's reasoning is the failure to recognize that if a defendant can obtain a drug through a valid prescription, its possession or use is not unlawful, and any defense based on medical necessity is obviated. The effect of the provision for an "exception" under *N.J.S.A.* 24:21–20(a) is simply to legitimate or de-criminalize possession of a drug that can otherwise be *validly* obtained by professional authorization. The "exception" has nothing to do with a possession or use that cannot be legitimated by a valid authorization. The necessity-justification defense in the context of this case relates to possession or use that is occasioned by medical necessity; such possession or use may be excused or legally justified, but it is not "lawful."

I am satisfied that in providing for the limited and unusual defense of justification under the Code, the Legislature has not harbored a purpose to exclude the possession or use of marijuana, a Title 24 Schedule I drug, from its consideration as a basis for "medical necessity." Nor has the Legislature expressed in any other provision or statute an intent or purpose to exclude marijuana from the Code justification defense. Further, the Legislature has not preempted the defense of medical necessity in this context by a clear explicit exception. Accordingly, I conclude that an affirmative defense based upon medical necessity may be raised as a legal justification under the Code with respect to the possession for use of marijuana, a Title 24 Schedule I controlled dangerous substance.

## III.

It follows from the conclusion that medical necessity for the possession of marijuana may constitute a justification defense under the Code that the standards governing the applicability of that defense in particular must be identified and applied. These standards, I suggest, are to be derived from the common-law doctrine of the necessity-justification doctrine, which has been infused into the Code.

The Court takes some solace in the observation that its holding eliminating the defense of necessity averts what would otherwise be a wholesale evasion of the criminal sanctions of Title 24. *Ante* at 71. Im my judgment, the Court's fears are exaggerated. Strict and workable standards governing the application of this defense can eliminate the risk of its abuse while at the same time accommodate the special, individual situation deserving of the defense. Consequently, it is imperative to consider the standards of the medical necessity defense that would be applicable in a case such as this. This is a subject not explored by the Court in view of its holding that the necessity-justification defense is not available to Title 24-Schedule I defendants as a matter of law.

As noted, defendant here served notice on the Monmouth County Prosecutor that he would rely on the defense of medical necessity at his trial. He contended that he was prepared to present evidence that he uses marijuana because it eases the severity of spastic contractions regularly suffered by quadriplegics and that no other prescribable medication gives him such relief. The trial court accepted this proffer in ruling that the justification defense was available. The court posited four criteria that the defendant must meet to support the claim of medical necessity. It ruled that a defendant who seeks to assert medical necessity as a justification defense must demonstrate by competent evidence that he has a medically recognized condition, that his condition is life- or sense-threatening, that use of an illicit substance ameliorates the condition or

relieves the pain, and that no legal, prescribable substance can provide similar relief without deleterious side effects. 194 *N.J.Super.* at 633. The court further held that a judge, not the jury, would decide the question of public policy—that is, whether the individual's need outweighs society's interest in enforcing the criminal law. *Id.* at 634. The court also ruled that the defense of necessity was an affirmative defense, which requires that the defendant first produce evidence supporting it, thereby shifting the burden to the State to disprove its existence. *Id.*

There is some decisional support for this position. In *Washington v. Diana,* 24 *Wash.App.* 908, 604 *P.*2d 1312 (1979), the defendant suffered from multiple sclerosis and claimed medical necessity as a defense to a charge of possession of marijuana. The court reversed his earlier conviction and remanded the case to the trial court to give the defendant an opportunity to demonstrate the alleged beneficial effect, if any, of marijuana on his symptoms, and to establish that his use of marijuana was medically necessary and therefore justified his possession. Significantly, the court required defendant to provide corroborating medical testing to support his assertions that he reasonably believed his use of marijuana was necessary to protect his health.

Additionally, in *U.S. v. Randall, supra,* 104 *Daily Wash.L. Rtpr.* 2249, the defendant grew and used marijuana and was arrested for possession. He raised the defense of medical necessity and provided expert medical testimony that revealed that prescribed glaucoma medications were ineffective and that defendant's experimental use of marijuana neutralized inner-ocular pressure and lessened visual distortion caused by the disease. In determining whether the evil to be avoided by the defendant's act was greater than that inherent in the possession and personal use of marijuana, the court balanced the defendant's interest in preserving his sight against the government's interest in controlling the drug. The court concluded that defendant's right to preserve his sight outweighed the government's interest in outlawing the drug. Special emphasis

was placed upon the importance of an individual's right to preserve and protect his own health and body.

Further, in *State v. Bachman*, 61 *Hawaii* 71, 595 *P*.2d 287 (1979), the need for adequate expert evidence in support of the defense was particularly emphasized. The court rejected the defense because defendant failed to show by competent medical testimony the beneficial effects upon the defendant's condition of marijuana use, in addition to the absence or ineffectiveness of conventional medical alternatives. The court noted that in the presence of such proof, medical necessity could be asserted as a defense to a charge of unlawful possession of marijuana.

This case law, coupled with the legislative intention to fashion a defense premised upon malleable common-law precepts, is instructive in formulating the standards relevant to the justification defense of medical necessity. Accordingly, I would hold that in order successfully to assert medical necessity as a justification defense in a case involving a controlled dangerous substance, a defendant must meet several criteria. The test would reflect a multi-faceted standard appropriately drawn from the common law. It would require: (1) the defendant must be suffering from a condition that involves intolerable pain, or an immediate, actual, or substantial threat to his life, health, vital senses, or basic physical or mental wellbeing; (2) the suffering experienced by the defendant from the harmful condition necessitates resort to unlawful conduct involving the prohibited controlled dangerous substance in order to eliminate, avoid, or substantially ameliorate the acuteness of the threatening condition; (3) there must be an absence of any other lawful treatment, substance or procedure that is available to the medical profession for the defendant that could similarly relieve the harmful condition or accomplish the same result as that achieved through the unlawful conduct; (4) it must be demonstrated that the defendant's decision to resort to the unlawful possession or use of the prohibited substance is based on reasonable necessity, which shall include a good-faith effort to relieve the harmful condition through normally-accepted medi-

cal treatment; (5) competent expert medical evidence must be submitted demonstrating (i) that the harmful condition was medically genuine, (ii) that the unlawful conduct eliminated or materially and substantially relieved the condition, and (iii) that there was no alternative treatment or substance legally available for the harmful condition; (6) it must be shown that the situation precipitating the decision by the defendant to engage in unlawful conduct to alleviate or eliminate the harmful condition was not brought about by any actions of the defendant; and (7) it must appear that from a social standpoint, under the circumstances, the criminal punishment of the defendant for the unlawful conduct is less important than allowing the defendant to obtain relief from the harmful condition.

I would also hold that the justification defense based upon medical necessity is an affirmative defense under the Code. *N.J.S.A.* 2C:3–1 and 2C:1–13c(1). Accordingly, the burden of proof is upon defendant to establish the essential elements of the necessity-justification defense by a preponderance of the evidence. *See State v. Toscano,* 74 *N.J.* 421 (1977). This will not of course negate the State's continuing obligation to establish beyond a reasonable doubt to the satisfaction of the jury all of the essential elements of the offense charged. *Ibid.*

These standards would impel me to rule in this case that defendant is entitled to demonstrate the availability of the necessity-justification defense. Defendant here claims he suffers violent and severe contractual spasms as a result of his quadriplegia. It is not clear whether in the actual circumstances there was an immediate urgency arising out of defendant's physical condition in connection with his possession of marijuana. However, the trial court correctly observed "neither the Model Penal Code nor the New Jersey Criminal Code use the words 'emergent' or 'emergency'." 194 *N.J.Super.* at 630. While under the common law the necessity defense generally required that immediate harm be threatened, it was also recognized in certain circumstances that if a ·progressive disease threatens health, preventive action need not wait until the

disease reaches an advanced state. *See, e.g., State v. Jackson, supra,* 71 *N.H.* at 553, 53 *A.* at 1022–23 (court recognized the medical necessity defense of a parent who kept its child from school to prevent her health from degenerating further, and did not require the child's illness to reach a near-fatal state before allowing preventive action to be taken). The necessity-justification defense may be applicable to acts prompted primarily by a reasonable fear of deteriorating health. Note, *supra,* 46 *Geo. Wash.L.Rev.* at 281.

I think it also important to acknowledge under defendant's proffer in this case that his affliction and its accompanying spasticity are a continuing condition. In this regard the trial court observed that "the public policy from which the justification of necessity springs is not disserved by applying the justification to a continuing condition as well as to an isolated incident." 194 *N.J.Super.* at 632. Thus, defendant's proffer discloses the existence of a condition that threatens his wellbeing.

Further, in conjunction with evidence as to the nature of the harmful condition, defendant offered to show that his possession of marijuana would serve to ameliorate his suffering. He was also prepared to demonstrate the absence of any lawfully available alternative medical treatment. I would add that in a case such as this, a limitation focusing upon the medical etiology of defendant's condition would prevent the justification defense from being improperly invoked on behalf of drug addicts and abusers claiming medical necessity as a defense to drug possession linked only to their addiction. Moreover, in this appeal, it has not been asserted that the situation precipitating the choice of evils was brought about by the conduct of the defendant. According to his proffer, defendant has no control over his spasms.

As noted, the choice made by the defendant—to commit a criminal act to overcome a harmful condition—must reflect reasonable necessity. Persons asserting medical necessity as

the basis for the justification defense must demonstrate that their belief in the efficacy of the illegal action is genuine and reasonable. *See Washington v. Diana, supra.* The reasonableness of that choice under the circumstances is a fact question. Among the factors that would be relevant is whether expert medical advice was obtained by a defendant prior to engaging in any illegal activity based on medical necessity. If the defendant had sufficient time to consult expert medical advice before the unlawful action was taken but failed to do so, reliance on self-diagnosis might well be found to be unreasonable and could defeat a claim based on medical necessity. The absence of medical advice, however, would be a circumstance that a jury would be entitled to consider in determining whether relief of the harmful condition by resort to unlawful conduct was reasonably necessary.

Defendant has also represented that he will by expert medical testimony produce evidence that the nature of the spastic condition from which he suffers genuinely threatens his wellbeing, that marijuana materially eases the pain of his spasms, and that no legally available drug or treatment can accomplish the same result. If defendant succeeds in demonstrating by competent medical testimony that the condition from which he suffers poses an acute health- or sense-threatening condition, that the beneficial ameliorative effects of marijuana upon this condition are substantial and material, and that there are no comparably effective available legal medical alternatives, he will have satisfied these requirements of the defense. *See State v. Bachman, supra,* 595 *P.*2d at p. 288.

In addition, reasonable medical necessity must take into account the nature and extent of the unlawful conduct in relation to defendant's condition. The nature and quality of the criminal offense must be comparatively weighed against the personal harm that is sought to be alleviated. In not all cases will the former be outweighed by the latter. Thus, for example, the criminal offense of the distribution, sale, or possession with intent to distribute marijuana, or the possession of an

amount of marijuana clearly in excess of defendant's personal medical needs, might well constitute offenses that would in particular circumstances militate against and outweigh the reasonableness of defendant's choice in breaking the law in this fashion. *Accord State v. Marzolf,* 79 *N.J.* 167 (1979).

Finally, in my view, the court must determine whether in the particular case as a matter of public policy the evil—the individual's suffering from a harmful condition—sought to be avoided by resort to unlawful conduct is demonstrably greater or more significant than the evil—possession and use of a controlled dangerous substance—that has been criminalized by society. Consequently, in a case such as this, the court must balance the defendant's interest in easing the severe spasms that threaten his senses and physical wellbeing against the State's interest in controlling marijuana possession. I am satisfied that the nature and extent of defendant's physical condition and the need for relief from that condition, if established by competent evidence in light of the standards set forth in this opinion, would outweigh the State's interest in criminalizing the possession of marijuana for personal use. *E.g. Washington v. Diana, supra,* 24 *Wash.App.* 908, 604 *P.*2d 1312; *U.S. v. Randall, supra,* 104 *Daily Wash.L.Rptr.* 2249. As observed by the trial court " 'necessity' enters into the picture when the illicit act is the only alternative and public policy dictates that society can accept that particular criminal act without exacting punishment for it in the face of the real harm it avoids." 194 *N.J.Super.* at 629–30. Society clearly has a compelling interest grounded upon universal, humanitarian impulses in not having an individual suffer needlessly. The severe, debilitating consequences inherent in the personal plight of a quadriplegic's recurring violent, spastic contractions summon the compassion of the community. The relief of such individual suffering takes on greater social significance than the societal benefits to be derived from imposing criminal sanctions upon the afflicted individual for his or her possession of marijuana. I credit the Legislature with having made this judgment.

## IV.

In conclusion, I am of the view that the affirmative defense of necessity-justification is available under *N.J.S.A.* 2C:3–2a to a defendant charged with the possession of marijuana, a Schedule I controlled dangerous substance under Title 24. Defendant's proffer in support of his claim of justification based on medical necessity is, in my estimation, sufficient to present a triable issue under strict but fair standards governing the application of this defense.

Accordingly, I would affirm the judgment below, and, therefore, respectfully dissent from the opinion of the Court.

GARIBALDI, Justice, dissenting.

I agree with my dissenting brethren that under narrowly-circumscribed conditions the affirmative defense of medical necessity may be available to certain seriously ill persons as a legal justification to the charge of possession of marijuana. In enacting *N.J.S.A.* 24:21–3(a), *N.J.S.A.* 24:21–5(a), and *N.J.S.A.* 24:21–20(a), the Legislature did not focus on whether in a medical emergency it was illegal to use a Schedule 1 controlled dangerous substance for a valid medical purpose.[1] The State's purpose in prohibiting the use of marijuana generally is not furthered by prohibiting the use of marijuana in certain exceptional cases—for example, by denying a cancer victim relief from excruciating pain, a glaucoma victim a chance to preserve his or her sight, or a quadriplegic or multiple sclerosis victim

---

[1] I agree with the dissent that at the present time participation in the program proposed under the Dangerous Substances Therapeutic Research Act (TRA), *N.J.S.A.* 26:21–1 to –9, does not offer a viable alternative to "an individual suffering severely and acutely from a condition that can be treated only by the use of the Schedule 1 drug." *Ante* at 85. Although there is surface appeal to the assertion that the TRA program offers such an alternative, it is refuted by reality. Dr. Thomas T. Culkin, who was the Executive Director of the Drug Utilization Review Council of the New Jersey State Department of Health and Administrator of the TRA program, testified at the hearing that the program "has never gotten off the ground in any practical sense."

relief from continuous recurring spastic contractions. In such cases, marijuana is the only medical treatment that ameliorates the condition or relieves the pain without deleterious side effects.

My dissenting brethren set forth criteria that a defendant must meet in order to assert the defense of medical necessity as a justification of his or her possession of a Schedule 1 drug. *Ante* at 90, 91. In establishing such criteria we must be concerned that defendants charged with violating drug laws not be able to claim as defenses all types of allegedly vital but actually tenuous connections between their illicit use of drugs and their physical or psychological ailments. This fear does not impel me to refuse the availability of the defense to the truly ill person in a life- or sense-threatening situation who is unable to find other viable medical treatment. It does lead me, however, to disagree slightly with my dissenting brethren on the requirements and parameters of the defense. I would impose an additional requirement.

The dissent allows the jury in determining if the defendant's action constituted a reasonable necessity to consider, as one factor, whether the defendant had obtained expert medical advice prior to engaging in the illegal activity. If the defendant had sufficient time to consult expert medical advice and failed to do so, the dissent states, "reliance on self-diagnosis might well be found to be unreasonable and could defeat a claim based on medical necessity." *Ante* at 93.

I would make such a requirement a matter of law. A defendant who has sufficient time to consult a medical expert before taking a Schedule 1 drug for medical purposes but fails to do so would be denied the use of the defense. It is only reasonable that the defense of medical necessity be based on expert medical opinion. "In medical necessity cases, the essential element of proof is the reality of the medical circumstances claimed to exist." Note, *Medical Necessity as a Defense to Criminal Liability: United States, 46 Geo.Wash.L.Rev.,* 273, 289 (1978). The defense of medical necessity should not be

allowed on the basis of a defendant's self-diagnosis or self-treatment.[2]

Accordingly, a defendant must establish prior to his or her possession of marijuana that a medical doctor advised the defendant of the serious nature of his or her medical condition, and for a reasonable period of time treated the defendant for this condition with the available legal medical remedies, all of which proved to be ineffective. This requirement would not eliminate the further condition imposed on defendant by (5)(1) of the dissenting opinion, *ante* at 91, to furnish competent medical-expert testimony that the unlawful conduct eliminated or materially and substantially relieved the condition.

The requirement that a defendant prove that he had expert medical advice before he purchased the Schedule 1 drug, together with the other criteria set forth in the dissenting opinion, will substantially reduce the potential for abuse of this defense by drug users. Under the standard for the defense of medical necessity set forth herein and in the other dissent, defendant Tate's proffer in support of his claims of justification based on medical necessity is sufficient to present a triable issue. Accordingly, I would affirm the judgment below.

*For reversal and remandment*—Justices CLIFFORD and POLLOCK, and Judges FRITZ and MICHELS, P.JJ.A.D. (temporarily assigned)—4.

*For affirmance*—Justices HANDLER, GARIBALDI and STEIN—3.

---

[2]Surprisingly, the courts that have allowed the defense of medical necessity have failed to address and resolve the issue of the validity of self-diagnosis and treatment. *U.S. v. Randall,* 104 *Daily Wash.L.Rptr.,* 2249 (D.C.Super.Ct.1976), and *Washington v. Diana,* 24 *Wash.App.* 908, 604 *P.*2d 1312 (1979), involved defendants charged with possession of marijuana. The defendant in the former testified that he used it to treat his glaucoma symptoms; defendant in the latter used it for relief of the disabling spasticity associated with multiple sclerosis. Both courts found medical necessity a defense to possession but emphasized its availability under very limited circumstances. Nevertheless, in both cases it appears that the defendant used the drugs based on his own self-diagnosis, which later was confirmed by expert medical testimony.