230 N.J. Super. 509 (1989)
553 A.2d 1356
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
JOSEPH CLAY, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued October 5, 1988.
Decided February 3, 1989.
*511 Before Judges KING, ASHBEY and SKILLMAN.
Robin A. Barbarczuk, Designated Counsel, argued the cause for appellant (Alfred A. Slocum, Public Defender of New Jersey, attorney).
Jack J. Lipari, Assistant Prosecutor, argued the cause for respondent (Jeffrey S. Blitz, Atlantic County Prosecutor, attorney; Thomas Cannavo, Assistant Prosecutor, of counsel and on the brief).
The opinion of the court was delivered by KING, P.J.A.D.
The issue in this case is whether a participant in the Intensive Supervision Program who fails to abide by the rules and leaves New Jersey is guilty of the crime of escape. N.J.S.A. 2C:29-5 defines the crime of escape:
a. Escape. A person commits an offense if he without lawful authority removes himself from official detention or fails to return to official detention following temporary leave granted for a specific purpose or limited period. "Official detention" means arrest, detention in any facility for custody of persons under charge or conviction of a crime or offense, or committed pursuant to chapter 4 [mental illness] of this Title, or alleged or found to be delinquent, detention for extradition or deportation, or any other detention for law enforcement purposes; but "official detention" does not include supervision of probation or parole, or constraint incidental to release on bail. [Explanation added.]
This penal statute became effective September 1, 1979 as part of the Code of Criminal Justice. L. 1978, c. 95.
*512 The Intensive Supervision Program (ISP or Program) was added to R. 3:21-10(e) by amendment adopted effective September 1983, in implementation of R. 3:21-10(b)(5) then adopted. Pressler, Current New Jersey Court Rules, Comment R. 3:21-10(e) (1988). R. 3:21-10(e) provides:
Intensive Supervision. Motions for change of custodial sentence and entry into the Intensive Supervision Program, as provided for in paragraph (b) of this rule, shall be addressed entirely to the sound discretion of the three-judge panel assigned to hear them. Because of the nature of the program, there shall be no administrative or judicial review at the several levels of eligibility established under the program. No further appellate review of the panel's substantive decision shall be afforded. The three-judge panel shall have the authority to resentence offenders, in accordance with applicable statutes, in the event they fail to perform satisfactorily following entry into the program. [Emphasis supplied.]
The ISP is essentially a post-sentence, post-incarceration program of judicial intervention and diversion back to the community. In discussing "the inherent power to dismiss an indictment in appropriate circumstances," State v. Abbati, 99 N.J. 418, 432-433 (1985), our Supreme Court collaterally described ISP several years ago:
This Court's authorization and the subsequent implementation of pretrial intervention programs, R. 3:28, is illustrative of that judicial responsibility. See State v. Leonardis, 71 N.J. 85, 89 (1976) (Leonardis I). See N.J.S.A. 2C:43-12 to 22 (Criminal Code codifies pretrial intervention program). The judicially-created Intensive Supervision Program is another example of the courts' inherent responsibility and power to manage efficiently the criminal justice system. In response to the overcrowding of our prisons, the judiciary proposed and subsequently authorized a program of conditional release from custody  a form of intermediate punishment between incarceration and probation  for certain carefully screened non-violent offenders. See Judicial Conference Planning Committee Final Report 85 (1982); R. 3:21-10(e). We note that this program was endorsed by the Executive branch. See Office of the Governor, Prison Overcrowding: A Plan of Action 9-10 (1982).
In May 1983 the Administrative Office of the Courts issued an informational pamphlet describing ISP. The program operates independently from the customary probation and parole programs. The traditional probation program operates as an arm of the courts in lieu of a custodial sentence. N.J.S.A. 2C:45-1 to -4. The traditional parole program, an exclusively executive function operated by the Parole Board, is implemented *513 post-custodially. N.J.S.A. 30:4-123.45 to -123.69. ISP rests between traditional probation and parole but is definitely a product of the judiciary. In that sense it is more like probation. In the sense that the convicted participant is taken out of prison, it is more like parole.
The ISP pamphlet's "Preface" described the reasons and purpose behind ISP:
In response to the prison over-crowding crisis the legislature funded an intensive supervision program to be operated by the Administrative Office of the Courts on an experimental basis. This program is designed to test whether an intermediate form of punishment, one which would be less costly than prison, but much more onerous than traditional probation, will achieve the criminal justice objective of deterrence  general and specific  as well as rehabilitation. This experiment is frankly innovative since it has never been tried before in New Jersey. While success of any social program cannot be assured, particularly one that attempts to deal positively and constructively with persons who have not succeeded elsewhere and which also intends to guard society against future criminality, nevertheless, this program has been carefully designed to present a realistic and tough-minded approach to one of the most difficult problems facing society today. [Intensive Supervision Program, at iii (1983).]
The ISP thus was funded by the Legislature ($1,000,000), endorsed by the Executive branch, and operated by the Judiciary. In a certain sense it functioned as a concert of traditionally separated powers. No specific legislation or court rules have formalized the operation's structure. The 1983 ISP pamphlet and its 1986 supplement seemingly embody the Program's operational standards.
The "Executive Summary" in the 1983 pamphlet contained the following descriptive summary of ISP:
The program provides a structure within which certain offenders sentenced to state penal institutions in the traditional fashion are afforded an opportunity to work their way back into the community under intensive supervision provided they present a plan which gives full assurance to a Screening Board and a Resentencing Panel of judges that their return will result in a positive social adjustment and will not jeopardize the public's safety.
Features of the program include:
... Development of individual plans for life in the community (work, study, community service, etc.);
... A state level intensive supervision service with operational assistance from the 21 county probation departments;

*514 ... A three member panel responsible for screening applicants and recommending placement into ISP to a Resentencing Panel for its consideration and action;
... An advisory board with public and private, professional and lay members;
... A capacity to remove up to 500 inmates from the state prison system at any one time;
... A sentencing practice whereby participants earn release into the program and must continue to demonstrate to staff and the Resentencing Panel that they should be allowed to remain in the program;
... The use of the best contemporary technologies and programs for managing cases;
... A requirement of full-time employment or vocational training and community service by each participant;
... A minimum of 5 contacts per week per participant;
... The use of a community sponsor and other support persons who will provide extensive assistance and direction to each ISP participant;
... A chief probation officer management team providing assistance on both state and local levels;
... A corps of experienced and well trained staff selected from the county probation departments; and
... The exclusion of violent (e.g., homicide, robbery and sex offenses) offenders and any offender with a mandatory parole ineligibility term from participation in ISP at this time. [Intensive Supervision Program at iv-v.]
The pamphlet's "Introduction" section explains the application procedure. The program is open to "inmates serving state prison sentences for nonviolent offenses, whose participation in the program will not be repugnant to public sensibilities, and for whom there is a reasonable probability of success." Intensive Supervision Program at 1. An inmate can apply for admission only after serving "a minimum of 30 days in custody and ... no later than 60 days after the execution of sentence." Ibid. The applicant must develop a plan upon release including provisions for living accommodations, meeting financial obligations, counseling, vocational and educational needs, and restitution. A Community Sponsor is necessary. The program is described as "an intermediate form of punishment, less onerous than incarceration but more restrictive than standard probation supervision." "Continuous monitoring" is promised and "compliance" must be absolute. The applicant is warned that "failure will result in immediate reincarceration." Ibid. [Emphasis *515 supplied.] The section entitled "program philosophy" again warns the applicant that failure will result in "immediate return to the institution." [Emphasis supplied.]
The information pamphlet describes the program's actual mechanics as follows:
If the applicant is deemed eligible for the program, his application will be forwarded to a 3 judge Resentencing Panel. The Panel will review the application for resentence to determine if the applicant is eligible for entry into ISP. If the Panel determines that the applicant is eligible, it will grant the application for resentencing and adjourn the hearing for 90 days, place the applicant on recognizance to the Community Sponsor and require adherence to the applicant's plan and conditions of ISP. During this trial period his behavior will be closely monitored.
At the conclusion of this period, the participant may reapply to the Panel for another 90 day release period. The Panel will assess the applicant's continuing motivation and commitment. If the Panel members conclude that he remains dedicated to his goals, they will continue his release pending resentence for a second 90 day period. Successful completion of this period will trigger a resentencing hearing at which the applicant will be resentenced pursuant to R. 3:21-10(b) to the original term of incarceration less the time served. Sentence will be suspended in accordance with N.J.S.A. 2C:45-1 et seq., subject to the program participant's continuing compliance with his plan and conditions of ISP. The maximum period of suspension will be the maximum term which was initially imposed or 5 years, whichever is less, minus time served. There will be periodic continuation hearings to assess compliance throughout the period of release. Failure to continue to aggressively fulfill the plan's obligations will result in a referral back to the Resentencing Panel for a violation hearing and reincarceration.

All ISP participants must successfully complete a minimum of one year of intensive supervision. Thereafter, they may be transferred from intensive supervision to regular probation supervision or be discharged entirely, at the discretion of the Resentencing Panel. [Intensive Supervision Program at 5-6; emphasis supplied.]
In May 1983 Chief Justice Wilentz formally implemented ISP by order. The order, contained in Intensive Supervision Program at 8-9, stated:
ORDER BY CHIEF JUSTICE
SUPREME COURT OF NEW JERSEY
ORDERED, pursuant to N.J.Const. (1947), Art. VI, Sec. II, par. 3 in furtherance of the establishment of the Intensive Supervision Program, that R. *516 3:21-10(b)(1) be relaxed to allow the court, upon motion, to change a custodial sentence to permit entry of the defendant into the Intensive Supervision Program. A motion pursuant to this Order shall be addressed to the sound discretion of the three-judge panel named herein, and shall be made in conformance with, and only when permitted by, the Intensive Supervision Program adopted by the Supreme Court. There shall be no administrative or judicial review at the several levels of eligibility established under the Program, nor any appellate review of the panel's substantive decision.
FURTHER ORDERED that a three-judge panel is hereby established to consider applications, filed by persons under sentence of imprisonment, for conditional release for purposes of entry into the Intensive Supervision Program. The panel shall also have the authority, pursuant to the Program, to resentence offenders in accordance with law in the event they fail to perform satisfactorily following entry into the Program.
FURTHER ORDERED that said three-judge panel shall consist of Superior Court Judges, Theodore Z. Davis, William F. Harth and John A. Marzulli, which panel shall hear all such applications.
This Order is effective immediately until further Order of the Court.
C.J.
DATED: May [26], 1983 [Emphasis supplied.]
The pamphlet's final portion, entitled ISP "Resentencing Procedure," treats the subject of the applicant's failure in this way:
If during the suspension the participant fails in his obligation to live up to the plan and ISP conditions, he will be brought back before the Resentencing Panel for review as to why he should not be returned to prison to serve his custodial sentence. If needed, a continuation hearing shall be scheduled to consider modifying the terms of ISP or withdrawing the ISP client from the program.
....
Violations
Violations of any of the intensive supervision conditions will result in the processing of a Violation of Intensive Supervision before the Resentencing Panel. Violations will conform to N.J.S.A. 2C:45-(3), (4) [2C:45-3, 4] and must be approved by the regional supervisor with a copy being forwarded to the director of the program. The Resentencing Panel shall hold a hearing to consider why the participant should not be returned to prison to serve the custodial sentence. [Intensive Supervision Program at 26, 30; emphasis supplied.]
In August 1986 a supplementary informational pamphlet was issued by the Administrative Office of the Courts titled "Supervisory Guidelines." These guidelines did not alter the material discussed above. The ISP informational pamphlets did not *517 mention or warn that failure in ISP will incur any additional criminal liability by prosecution for escape.
By way of further background, an article in the "Newark Star Ledger" of September 27, 1988 quotes Judge Marzulli of the Resentencing Panel concerning ISP's progress since 1983:
ISP was implemented in New Jersey in 1983 as an alternative to lockup in overcrowded prisons for persons convicted of minor crimes.
....
Marzulli said the New Jersey program is special due to the "unusual alliance" it has formed among judges, supervising probation officers and participants.
Normally, when a judge places someone on probation, it is the last time there will be any contact between the two, unless the defendant violates the terms of probation, Marzulli explained. In ISP, however, the judges take a "pro-active role" in the supervision, Marzulli added. He said monthly assessments and 90-day and 180-day reports are made to the jurists.
The judge said ISP is "truly a prison diversion program." In its five-year history, Marzulli said the program has graduated 465 participants. Since their graduation, Marzulli said six defendants have been convicted of indictable crimes and 18 others were convicted of disorderly persons offenses.
The 1987 Annual Report of the Administrative Office of the Courts contained the following summary on ISP:
The Intensive Supervision Program (ISP) continued to prove its effectiveness at supervising offenders released from prison. The figure below shows the outcome of supervision for all participants at the end of 1987. About one-quarter of those admitted into the program were returned to incarceration, but most of those returned had only programmatic violations rather than a new arrest. Only 7% of the persons admitted into the program were arrested or detained by a law enforcement officer. [7-4.]
Against this background, we reach this case's facts, related chronologically. Defendant originally pled guilty to a burglary offense in Atlantic County and on April 13, 1984 was sentenced to a five-year indeterminate term at Yardville, the Youth Reception and Correction Center. He got 42 days credit against this sentence for pretrial detention. He also received a consecutive 18-month sentence for violation of a two-year probation term he had received for theft in 1983. He had been serving that probation term when he committed the burglary to which he pled guilty in April 1984.
Defendant promptly applied for ISP while serving the five-year indeterminate term for burglary. On July 31, 1984 he was *518 admitted and resentenced to ISP by Judges Davis and Harth. No particular features of defendant's ISP regime are provided to us in this record. We imagine they were similar to those recently described in State v. Jiminez, 229 N.J. Super. 256, 258 (App.Div. 1988).[1]
On or about August 30, 1984, while free in the community, the defendant left the State of New Jersey without permission from the ISP program. At the time defendant was a suspect in a burglary of his former employer's home. Because he could not be found in this State a fugitive warrant issued on August 31. He then was arrested for burglary in Colorado on September 22; a Governor's extradition warrant was sent to Colorado; defendant eventually waived extradition and was returned to New Jersey, "at the expense of ISP," as the Prosecutor notes in his brief.
Defendant was convicted of burglary in September 1984 in Boulder, Colorado and sentenced on January 2, 1985 to four years in the Colorado State Prison. Eventually, after an ISP violation hearing on August 30, 1986 before Judges Marzulli, Harth and Bachman, defendant was returned to prison in New Jersey to serve his original sentences for "burglary and violation of probation," five years and a consecutive 18 months, respectively.
*519 Meanwhile, on August 15, 1985 the defendant had been indicted in a one-count indictment by an Atlantic County Grand Jury for the offense of escape, N.J.S.A. 2C:29-5(a). The indictment alleged in pertinent part that "on or about the 30th day of August 1984 in the City of Atlantic ... Joseph Clay did without lawful authority remove himself from the official detention of [the] Intensive Supervision Program following temporary leave granted for a specific purpose of limited period, contrary" to the statute. The indictment was placed on the inactive list on October 22, 1985 because defendant was in custody in Colorado. On November 3, 1986 defendant entered a plea of guilty to the charge of escape, N.J.S.A. 2C:29-5. On December 5, 1986 he was sentenced to a three-year term consecutive to the terms he was then serving after being dismissed from ISP and returned to prison.
On this appeal defendant contends that (1) his guilty plea lacked a sufficient factual basis, (2) his conviction for escape violated the Double Jeopardy Clause, and (3) his sentence was excessive. Since we agree with his first point and reverse, we do not reach the remaining points.
As the Prosecutor observed in his brief, "at the request of ISP, the Atlantic County Prosecutor's Office obtained an indictment for escape against defendant on August 15, 1985." In a letter of December 12, 1984 with the Administrative Office of the Courts' (AOC) letterhead and stationery (Robert D. Lipscher, Administrative Director; Harvey Goldstein, Assistant Director for Probation) with copies to Judges Marzulli, Harth and Davis, an ISP Administrative Assistant, Thomas W. Bartlett, requested the Atlantic County Prosecutor to indict the defendant for escape. He said:
The Intensive Supervision Program is requesting that your office proceed with an indictment charging the above captioned individual with escape. This individual was classified as an ISP absconder on August 30, 1984 and subsequently arrested on September 22, 1984 in Boulder, Colorado. He is scheduled for an extradition hearing in Colorado on December 21, 1984 and will likely be returned soon thereafter since he reported[ly] is not fighting extradition.

*520 I have enclosed all of the relevant ISP case material regarding this individual The regional supervisor to be contacted for any additional or clarifying information would be Ray Crowell, Southern Regional Supervisor (XXX-XXX-XXXX). The Supervising ISP Officer is James Ney (XXX-XXX-XXXX). I would recommend that both individuals be contacted.
If I can be of any further assistance in this matter, please contact me directly. I will forward to you the date and location of this individual upon his return to New Jersey as soon as available. A request has also been made to obtain the transcript of his ISP Resentencing Panel Hearing and will be forwarded upon receipt.
This policy of the ISP and the Resentencing Panel's request for initiation of criminal prosecution is further explained by ISP Director Richard Talty's letter under AOC's letterhead and stationery to the Atlantic County Prosecutor's Office on April 5, 1988:
You recently inquired of Thomas Bartlett of my staff as to when the Intensive Supervision Program Resentencing Panel first implemented the policy of recommending escape indictments against absconders from our program. I would like to review the history of that policy development.
In January 1984, the ISP Resentencing Panel comprised of Honorable John A. Marzulli, A.J.S.C. and Honorable William F. Harth, J.S.C. of Essex County, along with Honorable Theodore Z. Davis, J.S.C. of Camden County, decided that participants in the ISP who absconded from the jurisdiction of the program should be recommended to the appropriate County Prosecutor's Office for the issuance of an escape indictment. The Panel based their decision on the fact that ISP was considered "home detention" and that participants were receiving day for day credit for time spent under supervision of the program identical to the credit they would be receiving if they had remained within the custody of the Department of Corrections.
Since that time, the Resentencing Panel has informed participants on the record that should they abscond from ISP supervision a recommendation for an escape indictment will be recommended to the County Prosecutor when they are apprehended. The Panel also emphasizes that the penalty for escape is up to five years which, upon conviction, could run consecutive to the sentence imposed for a violation of the conditions of ISP.
All participants also sign a waiver of extradition in which it is spelled out that ISP will extradite anyone who absconds from the program. I believe that all participants clearly understand that they risk having an escape indictment returned against them if they abscond while under our supervision.
These two letters were placed in the record before us after we granted the State's "motion to supplement the record." Nothing in the record shows any warnings to defendant-appellant Clay about exposure to criminal escape charges if he left *521 the State. We have permitted the State to supplement the record with these two above-quoted letters. No record of Clay's ISP hearings has been offered to us.
In view of our conclusion that defendant did not commit the crime of escape, N.J.S.A. 2C:29-5, when he failed to comply with ISP regulations, we do not consider constitutional problems which might be raised by the doctrine of separation of powers where the judiciary initiates criminal prosecutions.[2] Initiating criminal prosecutions ordinarily is considered an exclusively executive function  the enforcement of the laws. See Morrison v. Olson, 487 U.S. ___, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988) (Scalia, J., dissenting). In dissent, Justice Scalia wrote, "Government investigation and prosecution of crimes is a quintessentially executive function." 487 U.S. at ___, 108 S.Ct. at 2626-27. See also Young v. U.S. ex. rel. Vuitton, 481 U.S. 787, 107 S.Ct. 2124, 95 L.Ed.2d 740 (1987).[3]
*522 Despite defendant's guilty plea he retains "the right on appeal to raise as reversible error the absence of a `factual basis for the plea.'" State v. Butler, 89 N.J. 220, 224 (1981); R. 3:9-2. See also State v. Taylor, 80 N.J. 353, 362 (1979). Under N.J.S.A. 2C:29-5 a person commits an offense "if he without lawful authority removes himself from official detention or fails to return to official detention following temporary leave granted for a specific purpose or limited period." The term "official detention" is defined as meaning "arrest, detention in any facility for custody of persons under charge or conviction of a crime or offense, or committed pursuant to chapter 4 [mental illness] of this Title, or alleged or found to be delinquent, detention for extradition or deportation, or any other detention for law enforcement purposes." N.J.S.A. 2C:29-5. [Emphasis supplied.] The term "official detention" in the statute does not include "supervision of probation or parole, or constraint incidental to release on bail." Ibid.
The State contends that because defendant left the State without permission and otherwise violated ISP's terms, he committed the crime of escape in violation of N.J.S.A. 2C:29-5. The State urges that ISP is within the scope of the language "any other detention for law enforcement purposes." But the State recognizes that "the statute is not explicit." It contends that the result it seeks, which requires "interpretation" in the light of "a reasoned analysis of the legislative history and an interpretation of the escape statute in conjunction with a careful examination of the purpose and nature of ISP," is necessary to preserve the integrity of the program.
*523 We disagree for several reasons. First, the statute provides no textual support for the State's argument. At the very best, the State's argument from the statute's text confronts ambiguity. Second, defendant was not detained in any sense in any particular facility or institution. He was free in the community, albeit under strict probation-type supervision. Third, ISP is obviously a hybrid  by its own description it is a novel and experimental program which shares traditional qualities of both probation and parole. As the State candidly notes, ISP did not exist conceptually in 1979 when the Criminal Code, including the "escape" statute, was adopted. The judiciary did not propose ISP until the Judicial Conference of 1982. State v. Abbati, 99 N.J. at 433; 1982 Judicial Conference Planning Committee Final Report 85. We can fairly conclude that the Legislature harbored no specific intent on whether failure in ISP was an "escape from official detention" when N.J.S.A. 2C:29-5 was adopted in 1979. The Legislature obviously stuck with the traditional physical detention versus supervised release in the community dichotomy in adopting the escape statute and did not make provision for future novel or experimental hybrids like ISP. In this context, the escape statute is ambiguous on how to treat ISP.
In light of the traditional doctrine that courts must strictly construe criminal statutes, we cannot strain to criminalize by judicial ukase or condone administrative criminalization of defendant's count in failing to comply with ISP. Our Supreme Court recently has observed as much when faced with the ambiguity of a criminal statute as applied to particular facts. State v. Valentin, 105 N.J. 14, 17-18 (1987). "Our most rudimentary guide in this case is the doctrine that penal statutes must be strictly construed." Id. at 17; In re Suspension of DeMarco, 83 N.J. 25, 36 (1980). 3 Sands Sutherland, Statutory Construction (4th ed. 1986), § 59.03 at 11.
Penal laws cannot be extended by implication or intendment. Where more than one reasonable interpretation may be made, or where the language is *524 ambiguous  and the ambiguity is not manufactured by the defendant  the construction must be drawn against the state. [Valentin, 105 N.J. at 18.]
Nor is the result we reach "absurd or impractical," as the Prosecutor suggests. See State v. Quinones, 140 N.J. Super. 237, 241 (App.Div. 1976), aff'd 75 N.J. 391 (1978). ISP's integrity is preserved by returning defendant to prison, possibly to serve out his maximum sentence if the parole authority finds a substantial likelihood that rehabilitation has not occurred. N.J.S.A. 30:4-123.53.
Moreover, the record provides no documentation that defendant was warned that failing in the concededly rigid ISP program and leaving the State exposed him to indictment for escape and additional criminal penalties. The most we see in the record before us are declarations that failure triggers a return to prison to serve his term or to be resentenced "in accordance with law." But even if he were warned, the statute does not clearly criminalize failure in this program where defendant is at large in the community under supervision and not at all in physical detention or custody.
The Legislature can amend the statute to clarify the ambiguity. In at least two very specific instances the Legislature has made it clear by statute that failure in a rehabilitation program characterized by a relaxed custodial environment and with a partial degree of freedom in the community was an "escape" from custody or detention for criminal purposes. In the "Comprehensive Drug Reform Act of 1986," N.J.S.A. 2C:35-1 to -23, L. 1987, c. 106, § 1, effective July 9, 1987, the Legislature specifically addressed this issue where a person convicted of a crime is placed in a residential drug treatment program. The statute clearly criminalized unauthorized departure from the residential program. "A person placed into a residential treatment program under this subsection shall be deemed to be subject to official detention for purposes of N.J.S. 2C:29-5 (escape)." N.J.S.A. 2C:35-14. The statute was the legislative response to State v. Reyes, 207 N.J. Super. 126, 141-145 (App.Div. 1986), certif. den. 103 N.J. 499 (1986), where *525 we concluded that leaving a residential drug center was not a crime under the existing definition of escape from official detention.
In State v. Walker, 131 N.J. Super. 547, 548 (App.Div. 1974), defendant one evening failed to return to custody in the work-release program. We held that the defendant was properly found guilty of escape from penal custody under our former statute, N.J.S.A. 2A:104-6. We read the statute in pari materia with another statute which recently had established work-release programs and which specifically had stated: "Any person admitted to outside labor or vocational training under this act who shall escape or attempt to escape while in such status outside the county institution shall be deemed to have escaped and treated in accordance with the law." Id. at 549-50 (citing N.J.S.A. 30:8-53). New Jersey also has a separate penal offense for "bail jumping," N.J.S.A. 2C:29-7, which specifically does not apply to obligations to appear in court while "on probation or parole." Of similar pertinence was the amendment of N.J.S.A. 2C:29-5 to include escapes from mental health facilities by persons under Title 2C commitments.
Before the effective date of the Code, State v. Kyles [Leo], 166 N.J. Super. 343, 347-350 (App.Div. 1979) held that the Code's escape provision (like those in title 2A) did not include persons committed to psychiatric institutions after being found not guilty by reason of insanity. Thereafter, this section was amended to include all persons committed pursuant to Chapter 4 of the Code. Thus, persons committed both as unfit to stand trial (2C:4-6) and as not guilty by reason of insanity (2C:4-8), are now subject to the penalties for escape if they abscond. [Cannel, Title 2C, Comment N.J.S.A. 2C:1-2 at 526.]
That the Legislature has not, in five years since ISP's inception, specifically criminalized conduct such as defendant's may evince some collective intent on its part that sanctions in addition to return to prison on the original sentence are unnecessary to preserve the integrity of ISP. Or it may mean that it has not been asked to act. But we do know from these examples that if the Legislature wants specifically to criminalize conduct in this ambiguous area, it knows precisely how to do it.
*526 Our conclusion is reinforced by the Commentary on "Escape" in Volume II: Commentary, Final Report of the New Jersey Criminal Law Revision Commission 287 (October 1971):
2. Escape. Subsection a follows prevailing law in defining escape simply as departure without lawful authority from official detention including departure from certain kinds of constructive custody. See N.J.S. 2A:104-6. It is important, however, that the concept of escape should not be extended to such things as failure of a probationer to report at a specified time to his probation officer, or to a parolee's violation of parole conditions by going outside a specified area. Ordinary administrative sanctions for breach of probation or parole are appropriate for such incident.
This Commentary echoes the comment on "escape" found in Model Penal Code and Commentaries § 242.6 at 261-262 (ALI 1980) which states:
2. Escape. Subsection (1) of this section provides that one commits escape if he "unlawfully removes himself from official detention or fails to return to official detention following temporary leave granted for a specific purpose or limited period." This provision follows prevailing law at the time it was drafted in defining escape simply as "unlawful departure" from official detention, including departure from certain kinds of "constructive" custody such as work-release programs, furloughs, court appearances, and release to attend funerals or to visit sick relatives. On the other hand, it is important that the concept of escape should not be extended to the failure of a probationer to report at a specified time to his probation officer or to a parolee's violation of parole conditions by going outside a specified area. Ordinary administrative sanctions for breach of probation or parole conditions are appropriate for such incidents. The definition of "official detention," as noted below, is accordingly specific in taking such situations into account. [Footnotes omitted.]
Section 242.6 of the Model Penal Code provides the source for our escape statute, actually verbatim in pertinent part. Id. at 265 n. 24. In agreement is Cannel, Title 2C New Jersey Code of Criminal Justice Comment N.J.S. 2C:29-5 (1988), who states:

Work Release, etc. Absconding while on work release status was held escape under pre-Code law. State v. Walker [Bobby James], 131 N.J. Super. 547 (App.Div. 1974). The specific reference to return after leave in the Code makes it clear that this holding is still applicable. Other kinds of restraint, however onerous, which are not tied to a correctional institution, but are in the nature of release on probation, parole, pre-trial intervention, or recognizance pending trial are clearly not within the escape provision. Other penalties are applicable to violation of conditions of those statutes; the specific language of this section requires reliance on them. It would also appear that, except as provided in 2C:35-14, facilities such as drug treatment centers and the like are *527 not covered by the escape section. Persons are not "detained" in them, persons not under criminal process are often present in them, and they were not subjects of escape under pre-Code law. State v. Babcock [Clifford], 157 N.J. Super. 107 (App.Div. 1978); State v. Smeen [Thomas], 147 N.J. Super. 229, 233 (App.Div. 1977), certif. den. 74 N.J. 263 (1977). And see State v. Reyes [Raymond], 207 N.J. Super. 126, 144 (App.Div. 1986), certif. denied 103 N.J. [499] 449 (1986). [Id. at 527.]
The MPC Comment adds that: "Bail jumping is separately treated in section 242.8, while conditional release on probation or parole carries its own sanctions." Model Penal Code and Commentaries § 242.6 at 264.
The State also argues that because an ISP participant receives "credit for time served against his sentence," he is, in effect, "in custody in the community." This very concept of "in custody in the community" is a logical contradiction. The "credit" argument is valid, the State says, because a conventional offender gets no prison "credit" for serving a traditional probation term. But such an offender has not received a prison term to get credit against. The Resentencing Panel's order returning defendant to State Prison, signed by Judge Bachman on October 20, 1986, stated: "Previous sentence reinstated; no credit August 30, 1984 to September 22, 1986." Defendant thus did receive credit for time served while he stayed and participated in the ISP program (July 31 to August 30, 1984). See State v. Reyes, 207 N.J. Super. at 145 n. 8. But receiving credit against a prison sentence for successful participation in a community program does not by legal alchemy convert that participation in the community-based program to a service of a prison term in custody or detention within the meaning of the criminal escape statute. Indeed, if an ISP participant succeeds in the Program's initial stages he may then be transferred to regularly-supervised probation for a period before his complete discharge into the community. Would failure in such regularly-supervised probation also be an "escape?" We see nothing talismanic about allowing prison credits for success in ISP which correlatively makes failure in the Program by leaving the *528 State an indictable crime. The criminal statute's applicability is at best unclear in the circumstance.
Our Supreme Court has noted that one of the chief purposes behind the New Jersey Penal Code was the Legislature's "deep concern with the common-law development of our criminal law." State v. Tate, 102 N.J. 64, 68 (1986). That legislative revision "found expression in a broad and sweeping codification that had as one of its main objectives the taking away from the courts of much of their discretion." Ibid. The Tate Court supported this conclusion:
The Criminal Law Revision Commission (Commission) adopted the following statement when it submitted its final report:
The time has come to create, for the first time in our history, a systematic, consistent, comprehensive [state] code to replace the hodge-podge that now exists. If criminal law is to be respected, it must be respectable. Important areas of [state] criminal law have never been put in statutory form * * *. It seems clear that such matters should not be left entirely to shifting and contradictory disposition by judges. [The New Jersey Penal Code, Final Report of New Jersey Criminal Law Revision Commission, Vol. I at ix (1971) (hereinafter Final Report).]
The codification of New Jersey's Criminal law reflected a "change in the basic responsibility for the growth and modernization of the criminal law  from court to legislature." Final Report, Vol. II: Commentary at 11. There is no question that included in the responsibilities shifted from the courts to the legislature was the responsibility for defining the scope of former common-law defenses.
The Commission would recommend codification of the general part of the criminal law. It is no longer sufficient for our statutes to simply define the elements of offenses. Modernization and rationalization compel enactment of statutory law on topics relating to culpability, excuse, justification, responsibility, etc. While our Supreme Court has done well to keep the common law alive and fluid in these areas, a more adequate job can be done by moving them into the area of legislative responsibility. The court itself has recognized that many changes must come from the Legislature. [Final Report, Vol. I at ix.]
[Id. at 69.]
Even the Supreme Court "in the exercise of its rule-making power cannot deprive the Legislature of its right to determine the type of conduct which constitutes a substantive crime." State v. Holroyd, 44 N.J. 259, 265 (1965); see also State v. Naglee, 44 N.J. 209, 226 (1965), reversed on other grounds, *529 Garrity v. New Jersey, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967); and State v. Ramseur, 106 N.J. 123, 252 (1987).
The Court has observed that "penal consequences cannot rest upon a mere presumption. Such legislative purpose must be expressed, and in clear and direct language." State v. Fair Lawn Service Center, Inc., 20 N.J. 468, 472 (1956). Indeed, even if the Court perceives that its ruling "produces an anomaly the most that this court can do is call the attention of the Legislature to the result." Id. at 474. Again, "the wisdom of a statute is not for the courts. * * * The most we can do is to draw attention to the result." Dacunzo v. Edgye, 19 N.J. 443, 454 (1955). Responding to a contention that the courts should modify the old crime of underage "statutory rape," Judge Kilkenny said, "The crime has been defined by the Legislature.... It is for that body, not the courts, to change the law, if it chooses to subscribe to a more liberal pattern of sex behavior with young females." State v. Moore, 105 N.J. Super. 567, 571 (App.Div. 1969), certif. den. 54 N.J. 502 (1969). Finally, State v. Roleson, 14 N.J. 403, 410 (1954), involved a situation where the legislative scheme seemed to have overlooked certain sentencing classifications. When asked for judicial relief for this oversight, our Supreme Court responded,
It may be that the Legislature has overlooked cumulative sentences of this particular class in relation to the basic minimum-maximum sentence policy. There would seem to be no discernible ground for excluding from this beneficent policy multiple successive sentences for offenses having a statutory maximum of one year. But that is a question for the Legislature. Supplying a casus omissus is not within the judicial province. [Ibid.]
Under our legal system, the Legislature should make the decision to find conduct such as defendant's a crime of escape. We fundamentally disagree with State v. Jiminez, 229 N.J. Super. at 258 (1988), in which another panel of this court ruled to the contrary, saying, "the issue of [ISP as] official detention has been considered by the program designers and administrators to be a settled question." Id. at 260. Leaving this State while at large in the community in ISP is not criminal conduct until the Legislature so states. We hold that the escape statute *530 "is sufficiently ambiguous to preclude its application to this defendant in this context without clarifying amendment." State v. Valentin, 105 N.J. at 23. Because the defendant did not commit the crime of "escape" as the Legislature defined, we vacate the guilty plea and, as a matter of law, reverse the conviction.
REVERSED.
NOTES
[1] The court described the conditions as follows:

... Defendant [Jiminez] was confined in a pre-approved residence from 8 p.m. to 6 a.m. every night and could have been required, at any given time, to wear an electronic wristlet, to allow closer surveillance of his movements. His residence was also open to unannounced, warrantless searches 24 hours a day. Defendant was not permitted to use drugs or alcohol, and was subject to random urinalysis tests to enforce that restriction. Moreover, he was required to obtain and maintain employment throughout his program sentence and was not permitted to obtain public assistance. These restrictions along with the intense, frequent and unscheduled observations by the ISP officers and community sponsors parallel the restrictions of incarceration.
[2] N.J. Const. (1947), Art. 3, § 1, par. 1 states:

The powers of the government shall be divided among three distinct branches, the legislative, executive, and judicial. No person or persons belonging to or constituing one branch shall exercise any of the powers properly belonging to either of the others, except as expressly provided in this Constitution.
See State v. Leonardis, 73 N.J. 360, 369-375 (1977) (discussion of separation of powers doctrine in context of diversion to the Pretrial Intervention Program  PTI).
[3] In a concurring opinion, Justice Scalia wrote:

The judicial power is the power to decide, in accordance with law, who should prevail in a case or controversy. See Art III, § 2. That includes the power to serve as a neutral adjudicator in a criminal case, but does not include the power to seek out law violators in order to punish them  which would be quite incompatible with the task of neutral adjudication. It is accordingly well established that the judicial power does not generally include the power to prosecute crimes. See United States v. Cox, 342 F.2d 167 (CA5) (en banc), cert. den. 381 U.S. 935, 14 L.Ed.2d 700, 85 S.Ct. 1767 (1965), and authorities cited therein; 342 F.2d, at 182 (Brown, J., concurring); id., at 185 (Wisdom, J., concurring); see generally United States v. Thompson, 251 U.S. 407, 413-417, 64 L.Ed. 333, 40 S.Ct. 289 [291-93] (1920). Rather, since the prosecution of law violators is part of the implementation of the laws, it is  at least to the extent that it is publicly exercised  executive power, vested by the Constitution in the President. Art II, § 2, cl 1. See Heckler v. Chaney, 470 U.S. 821, 832, 84 L.Ed.2d 714, 105 S.Ct. 1649 [1656] (1985); Buckley v. Valeo, 424 U.S. 1, 138, 46 L.Ed.2d 649, 96 S.Ct. 612 [691] (1976). [481 U.S. at 816-17, 107 S.Ct. at 2142; footnote omitted.]
See also State v. Schweitzer, 171 N.J. Super. 82, 85-86 (Law Div. 1979).