768 A.2d 248 (2001)
338 N.J. Super. 130
STATE of New Jersey, Plaintiff-Respondent,
v.
James A. FINAMORE, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted March 7, 2001.
Decided March 21, 2001.
*249 Gerald J. Monahan, Union City, attorney for appellant.
Ronald S. Fava, Passaic County Prosecutor, attorney for respondent (Jane E. Hendry, Senior Assistant Prosecutor, of counsel and on the brief).
Before Judges PRESSLER, KESTIN and CIANCIA.
The opinion of the court was delivered by CIANCIA, J.A.D.
Following a bench trial, defendant James A. Finamore was found guilty of the disorderly persons offense of knowingly violating a domestic violence restraining order. N.J.S.A. 2C:29-9b. He was sentenced to 364 days in the county jail, sentence suspended with two years probation. Psychotherapy and domestic violence counseling were ordered and appropriate fees and penalties were imposed.
On appeal, defendant contends the State failed to prove guilt beyond a reasonable doubt and further, that a 364-day jail sentence for a disorderly persons offense is illegal. The State concedes the illegality of the sentence but contends the conviction was properly entered. We are satisfied that on the record presented defendant's conviction must be reversed. The charge as brought was defective. The scope of any applicable restraining order was unclear, bordering on indecipherable, and the defendant's actions that prompted the contempt charge could not, as a matter of law, be found to constitute a knowing violation of an existing domestic violence restraining order.
The past relationship of defendant with his now former wife, Donna Aronson, is relevant to our determination.[1] *250 The parties were married in 1989 and their only child, a son, was born in 1991. A dual judgment of divorce was entered in December 1995. On October 6, 1992, Aronson was granted a final restraining order against defendant under docket number FV-16-2102-93 which, among other things, prohibited defendant from having "any contact with the plaintiff or harassing plaintiff or plaintiff's relatives in any way." At Aronson's request, that order was vacated in late November 1992. On September 9, 1999, a contempt complaint was filed against defendant alleging he had called Aronson "on the telephone four times on 9/9/99 in violation of FV-16-2102-93 issued 10/6/92...." It is that vacated complaint which ostensibly formed the basis of defendant's present prosecution and conviction.
Between the initial restraining order of October 6, 1992, and the filing of the criminal complaint, at least six other restraining orders were issued against defendant by five different judges. Only a municipal court temporary restraining order (TRO), dated April 11, 1993, and a Superior Court TRO, issued May 5, 1993, specifically prohibited defendant from having contact with Aronson and their son. A "final order" of April 15, 1993 did not prohibit contact with Aronson on its face, but it did say, "temp order to continue." As to visitation, the order is illegible in part, but it appears that visitation between defendant and his child was permitted. The transcript from the abbreviated hearing that preceded entry of the order makes clear that defendant was permitted supervised visitation with his son. Interestingly, that transcript also indicates the parties were willing to communicate with each other concerning defendant's employment prospects by leaving messages on answering machines or with third persons. A TRO issued on May 12, 1993 also specifically permitted visitation, while at the same time continuing the "TRO in the interim." On May 26, 1993, a final restraining order was entered that did not specifically prohibit contact with defendant's wife or their child but did specifically allow visitation, again, assumably with the child. That order also states, "order continued by consent" without further elaboration. We note that all of the orders subsequent to the April 11, 1993 order were continuances of the original order and were not entered as a result of new charges alleged, much less proven. The initial complaint of April 11, 1993 stated that defendant shouted at Aronson and threatened her with his "physical size." The record does not provide any detail concerning that allegation and there was apparently no evidential hearing to establish the facts. At the abbreviated hearing on April 15, 1993, defendant denied the domestic violence charges made against him by Aronson on April 11, 1993.
On October 19, 1993, defendant was tried for having contact with Aronson that allegedly constituted contempt of the May 26, 1993 restraining order. Defendant was found not guilty of that charge, but the parties apparently agreed that the order of May 26, 1993 was a final restraining order that was still in effect. A "judgment of acquittal and order for visitation" was entered on November 9, 1993, establishing defendant's visitation schedule with his son and stating that "all other provisions of the Court's prior Domestic Violence Order dated May 26, 1993 are continued."
Not surprisingly, the parties' marriage was headed for divorce. On December 13, 1995, while represented by counsel, the parties signed a detailed separation and property settlement agreement that was incorporated into a judgment of divorce entered on December 27, 1995. In relevant part that agreement provided:
The parties agree that their future relations shall be governed and fully prescribed by the terms of this Agreement;...
....

*251 Both parties accept this Agreement as fair, just and reasonable to their respective individual best interests; ...
....
The parties agree that on all major matters relating to the health, welfare and education of the child, they will confer with each other with a view to adopt and follow those policies which are in the best interests of the child.
2. The Husband shall have reasonable and liberal rights of visitation with... [the child] in accordance with the following schedule:
A. Every other weekend beginning Friday at 6:30 p.m. to Sunday at 6:00 p.m.;
B. Every Wednesday the Husband shall have visitation with ... [the child] from 5:30 p.m. Wednesday evening until the next morning unless the Wednesday visitations are modified, suspended, cancelled or otherwise in accordance with this Agreement;
C. Thanksgiving holidays shall alternate each year with the Husband having Thanksgiving in 1996. During the Husband's years, ... [the child] shall be returned on Thanksgiving evening no later than 8:30 p.m.;
D. Hanukkah, Passover, Rosh Hashana, Yom Kippur, Mother's Day, and the Wife's birthday with the Wife;
E. Christmas, until the following morning, Easter, Father's Day, and the Husband's Birthday with the Husband;
F. the parties agree to abide by the counsellor's/therapist's recommendations regarding summer vacations with the Husband;
G. [The child's] ... Birthday shall be shared by the parties; and
H. the above schedule supersedes any regular visitation.
....
4. The parties respectively shall promptly notify each other of illness and of other matters or problems affecting the child and his just welfare and happiness.
....
35. The parties agree that they will make available to each other all documents reasonably required to effect the purposes of this Agreement, including, but not limited to, insurance policies, deeds, affidavits of title, or other documents, whether now or in the future.
36. Each of the parties from time to time, at the request of the other, shall execute, acknowledge and deliver to the other any and all further instruments and such steps that may be reasonably required to give full force and effect to the provisions of this Agreement.
....
43. This Agreement contains the entire understanding of the parties, and there are no representations, warranties, covenants or undertakings other than those expressly set forth herein.
....
46. Each party shall at all times keep the other informed of his or her place of residence, and shall promptly notify the other of any change, giving the address of the new place of residence.
....
52. Husband and Wife each acknowledge that the settlement terms reflected in this Agreement represent a compromise and negotiated settlement.
....
57. As long as any provision contained herein remains unfulfilled, each party shall keep the other informed of his or her residence and telephone number or such other place as he or she may readily receive communications, informing the other of any change of such residency or place of communication within five days of the actual change thereof.
....
61. The restraining order entered on April 15, 1993 shall remain in full force *252 and effect subject only to contact specifically contemplated by this Agreement.
This brings us to the activities that form the basis of contempt charges against defendant and the conviction thereon for violating the no-contact provisions allegedly incorporated into the order of May 26, 1993. On Thursday, September 9, 1999, defendant dropped off his son at school with a note to Aronson that defendant would pick up the child on Sunday morning. Aronson saw the note that afternoon and called defendant, leaving a message on his machine that Sunday was part of the Rosh Hashanah two-day holiday and the child would not be able to visit with defendant. At about 9:00 p.m. the same evening, defendant got the message from Aronson. He then called her and left a message on her phone that he did not think Rosh Hashanah was a two-day holiday and he intended to pick up their son on Sunday. Aronson then called defendant and they yelled at each other for less than a minute before Aronson hung up. In that brief exchange Aronson felt defendant was being verbally abusive, although it is not clear exactly what was said by defendant other than comments critical of a "stupid Jewish therapist who made up the rules." Defendant called back twice more "practically immediately" and left messages on the answering machine.
Aronson then took the tape out of the answering machine so that she could bring it to court. Defendant called back a fourth time and was "yelling into the machine," although it is unclear exactly what was said. These four calls were apparently made in succession over a short period of time. Defendant testified he did not think the phone calls were in violation of any restraining order. He argued that the calls were permissible under paragraph 61 of the settlement agreement.
The trial judge listened to the tape of defendant's phone calls, as have we. He summarized the calls on the tape as follows:
[T]he first message that he's going to take her to court. This is not the agreement; that he would do something in her pocketbook. It would cost her money. He would get an attorney and do what he has to do and if that's the way she wants to play, it's going to cost her some money.
The second message says, I've read the agreement, it doesn't say anything about the second day; that he called his attorney and that he'll be there Sunday at 8:30 p.m. (sic) and it's her prerogative; and that he was going to tell ... [the child] that she was causing him problems and let ... [the child] really know what it's all about, and why this is being done. And I emphasize that because when I wrote it down, to be very frankly, [sic] it disturbed me.
And then the third message talks about causing a problem, these religious problems. Get in contact with the Court, mark my words. You want to be cooperative, you can have problems, and so forth, and you're not going to test me. And that the second day is a Jewish interpretation, and it's sick, and so forth and so on. To me, that was more, those two messages, and I find that to be more than just communicating for the best interest of the child with reference to visitation.
The trial judge obviously had difficulty resolving the apparent conflict between the restraining order and the settlement agreement:
All three messages give rise in my belief, that it was more than just what was required under the agreement if one was to accept that he had this right on the agreement, and that superseded the restraining order. I find that the agreement did not supersede the restraining order; that the restraining order is in effect; and he did have a right to discuss the best interest in visitation with her about this child, but not to the extent *253 that he went to. Nor do I find that it's appropriate to the extent he went to.
We share the trial judge's difficulty, but we find no evidential basis for concluding defendant knowingly violated a restraining order. Assuming, as the trial court and parties assumed, that the May 26, 1993 order was the order potentially violated, that order does not specifically preclude contact. At most, it refers back to one or more prior orders, two of which prohibited contact without elaboration and two of which specifically allowed defendant's visitation with his son. Indeed, the May 26, 1993 order itself allows such visitation. The settlement agreement is rife with provisions that invite or require contact of some sort between the parties. The State urges us to ignore the settlement agreement because, pursuant to N.J.S.A. 2C:25-29d, a final restraining order can only be dissolved or modified "upon application to the Family Part" and "only if the judge who dissolves or modifies the order is the same judge who entered the order, or has available a complete record of the hearing or hearings on which the order was based."
We are not persuaded by the State's contentions. The statute apparently assumes no interpretative problem with the existing order or orders. Here, in our view, the scope of allowable contact, totally aside from the settlement agreement, is ill-defined unless the position is taken that the orders were intended to preclude any and all contact between the parties. Obviously the orders, particularly that of May 26, 1993, contemplated some level of communication that would be inherent in defendant's visitation with his son. Indeed, during the October 19, 1993 prosecution of defendant, the prosecutor specifically acknowledged that "the reason that Mrs. Finamore and other complaining witnesses get restraining orders is to have no contact between the parties except when necessary and except with regards to the children and visitation." The parallels with the present prosecution are striking. The trial judge there had the same concerns we now express here. The problems enforcing no-contact orders that provide no guidance to the parties, particularly in light of past communications that neither party thought was objectionable, should have been patent after the failed prosecution of defendant on October 19, 1993. Moreover, we do not believe N.J.S.A. 2C:25-29d precludes a trial judge in a criminal trial from considering all relevant evidence when deciding if the State has proven beyond a reasonable doubt that the defendant has knowingly violated a restraining order. To that extent, the settlement agreement and the actual conduct of the parties is evidential. We also note that here the settlement agreement was moved into evidence as a joint exhibit without objection from the State.
The trial judge never specifically found that defendant had the requisite state of mind to violate N.J.S.A. 2C:29-9b. Defendant was not charged with violating a restraining order by conduct that constituted "a crime or disorderly persons offense," so it cannot be argued that finding defendant guilty implicitly included a finding of a specific mens rea. Defendant was convicted of the disorderly persons offense of knowingly violating a restraining order. Unfortunately, that finding was made without any real consideration of an essential element of the offense-defendant's state of mind. In light of all the factors we have mentioned, we are satisfied the proofs, as a matter of law, cannot support a finding beyond a reasonable doubt that defendant knowingly violated a restraining order.[2]
*254 Defendant's judgment of conviction is reversed.
NOTES
[1] Some undisputed facts and matters of record have been derived from the companion case of Aronson v. Finamore, A-3978-99T1, also decided this date.
[2] In listening to the tape, we heard nothing that would support a contempt charge for improper contact. Defendant sounded annoyed, frustrated and impatient, but neither his tone nor the content of his remarks could be considered threatening or abusive. The parties were quarreling, mostly by leaving messages, over their son's visitation with his father. Neither the subject matter nor its form of presentation warranted a contempt charge. See State v. Wilmouth, 302 N.J.Super. 20, 23, 694 A.2d 584 (App.Div. 1997) ("There are too many substantial and significant domestic violence matters requiring the urgent attention of the court system to squander judicial and prosecutorial resources on patently unmeritorious litigation which, moreover, unfairly subjects people to criminal penalties.")