**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0303-20

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

O.D.C.[1],

      Defendant-Appellant.

_____

Submitted May 25, 2021 — Decided June 10, 2021

Before Judges Yannotti and Mawla.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Burlington County, Docket Nos. FO-03-0306-20 and FO-03-0378-20.

Kalavruzos, Mumola, Hartman & Lento, LLC, attorneys for appellant (W. Les Hartman, of counsel and on the brief; Jessica A. Wilson, on the brief).

Scott A. Coffina, Burlington County Prosecutor, attorney for respondent (Alexis R. Agre, Assistant Prosecutor, of counsel and on the brief).

---

[1] We utilize the parties' initials pursuant to Rule 1:38-3(c)(12).

PER CURIAM

Defendant O.D.C. appeals from an August 18, 2020 judgment of conviction for contempt, N.J.S.A. 2C:29-9(b)(2), of a final restraining order (FRO) entered pursuant to the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35. We affirm.

By way of background, three children were born of defendant's marriage to M.C. The parties became estranged and were in the midst of divorce proceedings throughout this matter. Defendant was also involved in a relationship with a girlfriend, A.B., who had children of her own. In November 2018, M.C. filed a domestic violence complaint and following a trial received an FRO on December 18, 2018, which restrained defendant from having any contact with M.C. and their children. On March 27, 2019, the parties appeared for a hearing on an enforcement motion filed by M.C. alleging he violated the FRO. A Family Part judge entered an amended FRO, which continued to restrain defendant from contacting M.C., but granted him the ability to communicate with the children through the eldest child's cell phone and parenting time pursuant to an order entered in the parties' non-dissolution case. The FRO further noted M.C. should contact the police and file a criminal complaint "to address violations of the FRO[.]"

2

On July 30, 2019, defendant was tried for contempt of the amended FRO based on a complaint-warrant filed on behalf of M.C. The complaint-warrant alleged defendant downloaded a tracking application onto the eldest daughter's cell phone and used the cell phone to send messages to M.C. Defendant was convicted of contempt, sentenced to one year of probation, and ordered to pay fines and penalties.

On August 28, 2019, defendant sent the following text to M.C. and A.B.:

> Listen, [I] know I caused you guys a lot of problems, I regret for ever coming into either of [your] lives. I truly do. I wish I could have been what you guys needed in life. I always just wanted what was best for the kids. Please tell them I loved every[]day, and every[]day I woke up just wanting to spend more time with them. [A.B.], tell [your daughter] I love[] her and always will. She was someone I always aspired my kids to be. [M.C.], I know [you] hate me but I love [our kids] more than []anything please . . . just don't let them forget how much I loved them. I truly hope that they all have the best life they can possibly and I'm sorry for everything.
>
> I'm sorry for all the pain I caused [you] both.
>
> Please tell [. . . j]ust forget about me, they need to l[i]ve happy lives and it's up to [you] guys to take care of them. I'm sorry I'm leaving [you two] with this burden, but it's best for them. I'm toxic. I don't deserve to be around them. Please take care of them, and please, please tell them I love them all so much.
>
> [A.B.], [you are] the executor please just make sure my kids are cared for[.]

3 A-0303-20

I love them so [much.]

Goodbye[.]

Please tell them they deserved them me as their shit father.

On October 29, 2019, a second complaint-warrant was filed on M.C.'s behalf alleging defendant committed fourth-degree contempt, N.J.S.A. 2C:29-9(a), for communicating with her in violation of the amended FRO. The State downgraded and tried the charge as a disorderly person's contempt, N.J.S.A. 2C:29-9(b)(2).[2] The State presented testimony from M.C. and defendant testified in his defense.

M.C. testified the amended FRO in place at the time defendant sent his text prohibited contact or communication between the parties. She explained when she received defendant's text, she contacted his mother and together they contacted A.B. M.C. explained why she waited until October to report the contempt to police as follows:

> We were just in court in August and he was found guilty of violating the restraining order. And we're in court a lot with the divorce and the custody issues, and honestly I'm tired. Like I feel like it's a lose, lose for

---

[2] The trial also included a violation of probation charge for which the State presented the testimony of a probation officer, but it is unrelated to the issues presented on appeal.

me. Like either I'm being harassed by him, and if I speak up, then I'm in the court all the time like this . . . .

On cross-examination, M.C. further explained her reasons for reporting the contempt in the following colloquy with defense counsel:

> [Defense counsel:] Okay. And so what changed [o]n October 28[,] that caused you to at 9:50 at night drive to the police station . . . and report that text?
>
> [M.C.:] I went at night because I had to put all three kids to bed. But I believe that we were in court a little bit before that, and I had spoken to [the] [j]udge . . . about the harassment that . . . [defendant] was doing and violating the restraining order, and he said to go to the police station.
>
> [Defense counsel:] So your purpose in going to the police station that night was to report to the police the harassment that you felt [defendant] was doing to you?
>
> [M.C.:] Yes. I had told them about a few things that were happening at the time.
>
> [Defense counsel:] So your intent that night was not to solely report this text?
>
> [M.C.:] There was, I think, three matters that I spoke to the police about.
>
> [Defense counsel:] And what were those three matters?
>
> [M.C.:] That he continued to call [in] wellness checks [regarding the children] up to three times day. And I had started a new job, and he was harassing them and me, and my job was on the line because he wouldn't leave them alone.

5

Defense counsel sought to elicit testimony from M.C. that her true motive for reporting the contempt was that defendant had allowed the children to celebrate Halloween over M.C.'s religious objections and M.C. reported the contempt in retaliation. M.C. denied this was her motive and explained she allowed the children to play dress-up in costumes although she did not celebrate Halloween.

Defendant testified M.C. reported the contempt because she objected to defendant celebrating the children's birthdays and Halloween over her religious objections. Defendant admitted he sent M.C. the text and admitted the amended FRO contained no exceptions regarding the bar on communication between the parties. However, he denied sending the text with the purpose of harassing M.C. Instead, he claimed it was to ensure his "kids were taken care of." He claimed the text was his "last will and testament" because he believed he would be dead the next day. On cross-examination, defendant claimed he intended to take his own life and had "practiced for hours" how to cut his arm, yet testified when police responded to the incident, they took him home rather than to the hospital despite his testimony he had damaged his arms.

The trial judge found defendant guilty of violating probation and purposely and knowingly committing contempt of the amended FRO. The judge

A-0303-20

noted the amended FRO stated defendant was "prohibited from having any oral, written, personal, electronic, or other form of contact or communication with [M.C.]"  The judge found the State proved the contempt because the amended FRO

> was served personally upon [defendant] on March 27[], 2019, at approximately 2:18. . . .
>
> The fact that he was present, was served with the . . . amended [FRO], and the fact that he made reference to actually the other individual for which he sent a text message to, as well as [ . . . M.C.] the victim in this matter, the [c]ourt does find that it was his conscious purpose to send that text message.  He referenced their children, and again he referenced [M.C.] by name.

The judge also rejected defendant's claim the text was intended to be his last will and testament because the amended FRO contained no exceptions to the bar on communication between the parties.

The judge concluded the State met its burden of proof beyond a reasonable doubt because it proved the existence of the amended FRO, defendant was served with it, and he sent the text in violation of its clear terms because he testified "[i]t was his purpose and intention for this message to be sent to get to A.B., as well as [M.C.], as he stated[,] a last will and testament."

The trial judge rejected defense counsel's argument that the case be dismissed on de minimis grounds.  The judge found as follows:

> This was a text message between the parties, and it was a rather long text message where [defendant] spoke to [M.C.] by name, the children by name, and then discussed their relationship. The . . . [c]ourt doesn't find that that is de minimis as it relates to the proceeding here today. And . . . certainly not only is [it] not de minimis, but . . . [based upon] the testimony of [M.C.], it calls for alarm, because she contacted [defendant's] parents when she received this text message. So the [c]ourt doesn't find it to be de minimis, it does find it to be a violation.

The judge sentenced defendant on the violation of probation ordering him to complete his probation as previously ordered, have a psychiatric evaluation, and pay mandatory fines and penalties. He also sentenced defendant on the contempt charge to a mandatory thirty-days in Burlington County jail and a one-year term of probation to run concurrent with his sentence on the violation of probation.

Defendant raises the following points on this appeal:

> POINT I:
>
> [DEFENDANT]'S TEXT MESSAGE DID NOT VIOLATE THE TERMS OF THE FINAL RESTRAINING ORDER.
>
> POINT II:
>
> THE TRIAL COURT FAILED TO TAKE INTO CONSIDERATION [DEFENDANT]'S EXTENSIVE HISTORY OF PSYCHIATRIC ILLNESS WHICH

8

PREVENTED HIM FROM FORMULATING THE REQUISITE INTENT TO COMMIT CONTEMPT.

POINT III:

[DEFENDANT] CAN ESTABLISH THE COMMON-LAW DEFENSE OF NECESSITY.

POINT IV:

[DEFENDANT]'S ORIGINAL COUNSEL WAS CONSTITUTIONALLY INEFFECTIVE.

"The scope of appellate review of a trial court's fact-finding function is limited. The general rule is that findings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 411-12 (1998) (citing Rova Farms Resort, Inc. v. Invs. Ins., 65 N.J. 474, 484 (1974)). "Deference is especially appropriate 'when the evidence is largely testimonial and involves questions of credibility.'" Id. at 412 (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997)). Moreover, "[b]ecause of the family courts' special jurisdiction and expertise in family matters, appellate courts should accord deference to family court factfinding." Id. at 413. However, we do not defer to the judge's legal conclusions if "based upon a misunderstanding of . . . applicable legal principles." T.M.S. v. W.C.P., 450 N.J. Super. 499, 502 (App. Div. 2017) (quoting N.T.B. v. D.D.B., 442 N.J. Super. 205, 215 (App. Div. 2015)).

9

I.

In Point I defendant re-asserts the purpose of his text was to have it serve as his "last will and testament for his children" rather than violate the amended FRO. Defendant repeats the argument that M.C.'s delay in reporting the contempt shows she did not fear defendant, but instead retaliated against him for the parties' dispute over Halloween and to gain an upper hand in the parties' divorce. Defendant also repeats the claim the complaint should have been dismissed on de minimis grounds. Defendant claims the trial judge failed to reference a February 7, 2020 amended FRO, which permits communication regarding the children between the defendant and M.C. and claims the judge incorrectly relied on the March 27, 2019 amended FRO.

In contempt proceedings, "the primary consideration is vindication of the authority of the court . . . [as] court orders must be obeyed." In re Adler, 153 N.J. Super. 496, 501 (App. Div. 1977) (internal quotation marks omitted); see also State v. Gandhi, 201 N.J. 161, 189 (2010) ("Restraining orders are entered for purposes of shielding a victim who needs protection and who is compelled to seek judicial assistance to obtain that security; thus, we have insisted on full compliance with restraining orders no matter the flaws a defendant may discern in their form or entry.").

A-0303-20

A person is guilty of contempt "if that person purposely or knowingly violates any provision in an order entered under the provisions of the [PDVA.]" N.J.S.A. 2C:29-9(b)(1). If the violation is not itself a crime or a disorderly person's offense, then contempt is a disorderly person's offense. N.J.S.A 2C:29-9(b)(2). The State satisfies its burden by proving a "knowing violation of an existing domestic violence restraining order." State v. Finamore, 338 N.J. Super. 130, 132 (2001).

N.J.S.A. 2C:2-2(b) defines the requisite mens rea as follows:

> (1) Purposely. A person acts purposely with respect to the nature of his conduct or a result thereof if it is his conscious object to engage in conduct of that nature or to cause such a result.
>
> (2) Knowingly. A person acts knowingly with respect to the nature of his conduct or the attendant circumstances if he is aware that his conduct is of that nature, or that such circumstances exist, or he is aware of a high probability of their existence. A person acts knowingly with respect to a result of his conduct if he is aware that it is practically certain that his conduct will cause such a result.

"[T]he evidence must allow at least a reasonable inference that a defendant charged with violating a restraining order knew his conduct would bring about a prohibited result." State v. S.K., 423 N.J. Super. 540, 547 (App. Div. 2012). The statute "may not be construed in a manner that precludes otherwise

11

reasonable conduct unless the orders issued pursuant to the [PDVA] specifically proscribe particular conduct by a restrained [party]." State v. Krupinski, 321 N.J. Super. 34, 45 (App. Div. 1999).

We reject the arguments defendant has repeated related to the trial judge's contempt findings and affirm substantially for the reasons expressed in the judge's oral opinion. We add the following comments.

The State clearly proved defendant knew there was an amended FRO in place prohibiting him from contacting M.C., yet he sent the text to her in violation of the court ordered restraints. We have no reason to second guess the judge's rejection of defendant's claim that he merely intended to communicate his last will and testament to M.C. or the assertion that M.C. reported the contempt to retaliate against defendant, especially given her credible explanation for the delay in reporting the contempt. In light of our standard of review, there is substantial credible evidence in the record to support the judge's findings of fact.

Furthermore, we reject as without merit, defendant's argument that the trial judge relied upon the wrong version of the amended FRO. Defendant's contempt occurred sixth months prior to the February 7, 2020 amended FRO, which permitted the parties to communicate through the OurFamilyWizard

application regarding the children. Defendant committed contempt when the terms of the March 27, 2019 amended FRO controlled, which prohibited him from communicating with M.C. in any manner. The February 2020 amended FRO was irrelevant. Even if it was applicable, defendant still committed contempt because he communicated via text and relayed alarming information to M.C. having nothing to do with a parenting issue.

For these reasons, we also reject defendant's repeated argument that his conduct warranted dismissal on de minimis grounds. In State v. Hoffman our Supreme Court stated, "in the area of domestic violence, as in some other areas in our law, some people may attempt to use the process as a sword rather than as a shield." 149 N.J. 564, 586 (1997). The trial court must therefore serve "as the gatekeeper" by applying the "[s]elf-regulating provision in the Code, . . . [namely] the de minimis infraction provision." Ibid. N.J.S.A. 2C:2-11(b) states a court may dismiss a prosecution if it finds the defendant's conduct "[d]id not actually cause or threaten the harm or evil sought to be prevented by the law defining the offense or did so only to an extent too trivial to warrant the condemnation of conviction."

"Sympathetic considerations play no part in a determination" under the de minimis statute. State v. Brown, 188 N.J. Super. 656, 670 (App. Div. 1983).

13

"An objective consideration of surrounding circumstances is authorized." State v. Smith, 195 N.J. Super. 468, 472 (Law Div. 1984). "Judicial discretion . . . takes into account the law and the particular circumstances of the case before the court." Higgins v. Polk, 14 N.J. 490, 493 (1954).

We affirm the rejection of defendant's de minimis defense for the reasons articulated by the trial judge. Defendant's communication of thoughts of self-harm, even if couched as an effort to communicate his final wishes to his children, were still addressed in a communication he sent directly to M.C. Given the history of domestic violence, the trial judge did not abuse his discretion in finding this conduct was not trivial and did not require a dismissal on de minimis grounds pursuant to N.J.S.A. 2C:2-11(b).

II.

We reject the argument raised in defendant's Point II, namely, the judge failed to consider defendant's psychiatric history and whether he possessed the capacity to formulate the requisite intent to commit contempt. Defendant argues he was "severely decompensated and in need of help," and the text was a "cry for help" and akin to an emergency call for assistance following an automobile accident. In support of his argument, defendant includes his medical records as a part of his appellate appendix.

Rule 2:5-4(a) states: "The record on appeal shall consist of all papers on file in the court . . . below, with all entries as to matters made on the records of such courts . . . ." We do not consider questions not properly presented to a trial court unless the issue raised relates to the jurisdiction of the trial court or concerns a matter of great public interest. Nieder v. Royal Indem. Ins., 62 N.J. 229, 234 (1973).

Defendant did not adduce the medical records evidence before the trial judge. Therefore, we cannot consider evidence not presented to the trial judge for the first time on appeal. Furthermore, this was not defendant's strategy at trial as demonstrated by the following colloquy during the State's summation:

> [Prosecutor: Defendant] also acknowledged that he knowingly typed [M.C.'s] address into that phone, that he knowingly sent that text message to her. What we are supposed to take away from this is that because he was suicidal at the time, it's de minimis, and it really doesn't count because he wasn't in the right frame of mind. And I would argue that that is certainly –
>
> [Defense counsel]: I object, Your Honor. . . .
>
> THE COURT: Okay. What's your objection?
>
> [Defense counsel]: I — in my closing, and certainly during our testimony, we did not state that he was not in his right mind when he sent that text and that's our excuse. That is not what we said.
>
> THE COURT: Okay. Thank you.

15

For these reasons, the judge did not err for not considering defendant's psychological condition.

## III.

In Point III, defendant argues the common law defense of necessity applied because of his "clearly documented history of mental illness," which required him to communicate his last will and testament to his children through the only means possible.  We disagree.

A defendant asserting the necessity defense must establish the following:

> (1)  There must be a situation of emergency arising without fault on the part of the actor concerned;
>
> (2)  This emergency must be so imminent and compelling as to raise a reasonable expectation of harm, either directly to the actor or upon those he was protecting;
>
> (3)  This emergency must present no reasonable opportunity to avoid the injury without doing the criminal act; and
>
> (4)  The injury impending from the emergency must be of sufficient seriousness to outmeasure the criminal wrong.
>
> [State v. Romano, 355 N.J. Super. 21, 29 (App. Div. 2002) (citing State v. Tate, 194 N.J. Super. 622, 628 (App. Div. 1984), rev'd on other grounds, 102 N.J. 64 (1986)).]

16

"The 'necessity' defense is based on public policy" and it "[e]ssentially . . . 'reflects a determination that if, in defining the offense, the legislature had foreseen the circumstances faced by the defendant, it would have created an exception.'" Ibid. (citing Tate, 102 N.J. at 73). "Thus, 'the defense is available at common law only when the legislature has not foreseen the circumstances encountered by a defendant.'" Ibid. (citing Tate, 102 N.J. at 74).

In Romano, we reversed the defendant's DWI conviction where he drove his car while intoxicated in order to escape assailants who had severely beaten him. Id. at 36. We noted the trial judge interpreted defendant's necessity defense as a duress defense and shifted the burden of proof to defendant to prove the defense rather than requiring the State to disprove it. Id. at 23. We concluded the necessity defense applied and defendant was entitled to a judgment of acquittal because "the Legislature did not weigh the competing value of driving while intoxicated to escape a brutal, and possibly deadly attack, against the values served by ridding the roads of drunk drivers." Ibid. We held the facts were "so bizarre and remote from the public policy underlying the law that even a [c]ourt as committed as this one to the strict enforcement of the drunk-driving statutes can pause to make certain that no injustice has been done." Id. at 33 (citing State v. Fogarty, 128 N.J. 59, 74 (1992)).

A-0303-20

Defendant likens his case to <u>Romano</u> and argues the facts here are "so remote from the public policy underlying the [PDVA] that the [c]ourt must pause to make certain that no injustice is done." He alleges because he thought he was going to successfully commit suicide after he sent the text and would be dead by the morning, his actions are "clearly an injury of sufficient seriousness to outweigh the criminal wrong."

We reject defendant's arguments because he failed to raise the necessity defense at trial. <u>See</u> <u>Nieder</u>, 62 N.J. at 234. Even if the defense was raised, the record does not demonstrate the second, third, or fourth <u>Romano</u> factors were met. Defendant was neither hospitalized, nor administered emergency psychiatric treatment. Furthermore, defendant had alternatives to violating the amended FRO such as expressing his wishes to other persons who could deliver his message to the children or doing so in a writing not addressed to M.C.

Moreover, defendant's conduct was not beyond the Legislature's considerations when it enacted the PDVA. The purpose of the PDVA is to "assure the victims of domestic violence 'the maximum protection from abuse the law can provide.'" <u>Hoffman</u>, 149 N.J. at 584 (quoting N.J.S.A. 2C:25-18). The Act "effectuates the notion that the victim of domestic violence is entitled to be left alone. To be left alone is, in essence, the basic protection the law seeks

A-0303-20

to assure these victims." Ibid. Defendant's conduct was exactly contrary to and violative of the public policy of the PDVA. Accepting defendant's logic that he had to violate the amended FRO in order to communicate his thoughts would elevate impulsive conduct by a perpetrator of domestic violence to the detriment of a victim of domestic violence, thereby nullifying the PDVA's purpose.

IV.

Finally, defendant argues his trial counsel was ineffective. He claims counsel "was a pro-bono appointed [a]ttorney, whose primary practice area was medical malpractice in Philadelphia, Pennsylvania [and] she was completely unfamiliar with criminal law and procedure as a whole and specifically in New Jersey." He argues counsel "failed to contact the Office of the Public Defender to request that they hire an expert to assess [defendant's] ability to formulate the requisite intent for the offense", she "failed to file a de minimis motion with the Assignment Judge", and she "failed to plead the 'necessity' defense."

"Ineffective-assistance-of-counsel claims are particularly suited for post-conviction review because they often cannot reasonably be raised in a prior proceeding. . . . Our courts have expressed a general policy against entertaining ineffective-assistance-of-counsel claims on direct appeal because such claims involve allegations and evidence that lie outside the trial record." State v.

19

Preciose, 129 N.J. 451, 460 (1992).  For these reasons, we decline to consider defendant's claims raised for the first time on appeal because they include allegations outside of the appellate record.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0303-20